In re Consolidated Pre-Trial Proceedings in MEMOREX SECURITY CASES.

Charlotte GRAD, Plaintiff,

v.

MEMOREX CORPORATION et al., Defendants.

Nos. C–71–1685 SW including C–71–1685 SW; C–71–2027 SW; C–71–2184 SW; C–71–2460 SW; C–72–37 SW; C–72–38 SW; C–72–39 SW and C–72–101 SW.

United States District Court, N. D. California.

June 19, 1973.

As Amended Aug. 7, 1973.

San Francisco, Cal., Jeffrey A. Fillman, Eaton, Van Winkle & Greenspoon, New York City, Phillip Gainsley, Gainsley & Gainsley, Minneapolis, Minn., Mordecai Rosenfeld, New York City, Stuart A. Schlesinger, Julien, Glaser, Blitz & Schlesinger, New York City, Stanley Rogers, Rogers & Harris, Beverly Hills, Cal., Albert E. Levy, Goldstein, Barceloux & Goldstein, San Francisco, Cal., David G. Finkelstein, Monaco & Reeve, San Mateo, Cal., David B. Gold, San Francisco, Cal., Robert Morgan, Morgan, Beauzay & Hammer, San Jose, Cal., Gaston, Snow, Motley & Holt, Boston, Mass., Abraham L. Pomerantz, Pomerantz, Levy, Haudek & Block, New York City, David Berger, Leonard Barrack, Law Offices of David Berger, Philadelphia, Pa., for plaintiff.

Melvin R. Goldman, Robert D. Raven, Michael G. Egger, Morrison, Foerster, Holloway, Clinton & Clark, San Francisco, Cal., for defendant Memorex and Laurence L. Spitters.

Simon H. Rifkind, Paul J. Newlon, Joseph J. Ackell, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants A. Chaney, P. C. Hale, T. R. Sandberg, B. C. Schmidt, F. M. Van Eck, T. Vermeulen and Z. Zaffaroni.

Gilbert J. Premo, Richard J. Lucas, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., for defendant Gordon E. Pilcher.

John H. Sears, Vernon L. Goodin, Terry E. Sheldon, Bronson, Bronson & McKinnon, San Francisco, Cal., and Charles W. Boand, Wilson & McIlvaine, Chicago, Ill., for defendant Arthur Andersen.

## MEMORANDUM AND ORDER CERTIFYING CLASS ACTION

SPENCER WILLIAMS, District Judge.

### Facts

Memorex Corporation is a manufacturer of computer tapes, disc packs and

Joseph W. Cotchett, San Mateo, Cal., Thomas Elke, Farella, Braun & Martel,

"peripheral equipment." It is incorporated under the laws of California and its stock is traded on the New York Stock Exchange.

Prior to 1970 Memorex sold its peripheral equipment to intermediaries who in turn leased the equipment to computer users. In May of that year Memorex, in an attempt to improve its competitive position in the industry, embarked upon a plan whereby it would lease its peripheral equipment directly to the user. As envisaged by the management, Memorex would secure leases of its peripheral equipment directly from users and then sell the equipment, subject to the leases, to Independent Leasing Corporation ("ILC") which was incorporated to serve as the leasing entity. Outside financing was required to implement the plan, and although negotiations were commenced immediately with major lenders, the terms of the financing were not entirely crystalized by July 1970, the date of the first alleged misstatements. While Memorex initially anticipated completion of the ILC capitalization by the third quarter, the financing was not consummated until December 29, 1970. Prior to that date ILC was funded entirely out of Memorex pockets.

In describing the ILC transaction to its shareholders and the public, Memorex chose to characterize the revenue from "sales" to ILC on an "as if" basis; i.e., as if the financing by the third party lenders were already completed. These lawsuits, in essence, are based on the contention that this method of reporting violated accepted accounting principles, misled the investing public as to corporate earnings and artificially inflated the value of Memorex stock all in violation of Sections 10(b) and 13 of the Securities Exchange Act of 1934 and other laws and regulations.

The communications in which the alleged misrepresentations are found as well as other documents and events necessary to understand the dynamics of this case are as follows:

MEMOREX INTERIM REPORT—SIX MONTHS ENDED JUNE 30, 1970 (Dated August 3, 1970).

In this report to the shareholders total revenues of $47,704,000 for the preceding six month period were described. Included in that sum were sales of peripheral equipment to ILC in the amount of $2,447,550. The report stated that "[t]he remaining prerequisite to growth of Memorex's equipment products business is the ability to lease computer equipment. We are currently at work with a number of financial institutions to procure financing for leases of equipment by our customers. We expect to consummate this financing arrangement during the Third Quarter."

SEMI-ANNUAL REPORT (FORM 9–K) FOR THE SIX MONTH PERIOD ENDING JUNE 30, 1970 (Dated August 6, 1970).

This report, filed with the SEC pursuant to Section 13 of the Act, also included sales to ILC as part of the total revenue for the period.

INTERIM REPORT—NINE MONTHS ENDED SEPTEMBER 30, 1970 (Dated November 9, 1970).

This report stated that revenues for the nine-month period were $79,133,000, of which sales to ILC represented $14,111,000. The report made the following reference to ILC: "The nine months' sales include $14,111,000 of computer peripheral products sold to [ILC], a new corporation organized to purchase peripheral equipment which Memorex manufactures and markets under leases to computer users. Efforts are currently underway to complete the permanent financing of ILC by long term loan arrangements with . . . financial institutions. . . . Payment to Memorex for ILC's purchases is dependent upon the success of such ef-

forts and will be made when ILC's financing is completed."

## WALL STREET JOURNAL ARTICLE (Dated November 20, 1970).

This article reported that the propriety of Memorex's accounting methods with respect to the ILC transaction was being challenged by some certified public accountants.

## NOVEMBER 20 PRESS RELEASE.

Issued by Memorex in response to the Wall Street Journal article, this release defended the November Report as "clearly describ[ing] the accounting for sales to Independent Leasing Corporation . . .", and stated that "Until the financing of [ILC] is completed, no further discussion by Memorex will be made of the subject."

On this date the New York Stock Exchange ("NYSE") halted trading of Memorex securities.

## NOVEMBER 23 PRESS RELEASE.

Notwithstanding the statement last quoted, Memorex issued another press release on November 23 "in order to clarify the questions which have been raised concerning [sales to ILC]." The release detailed the history of the ILC transaction and ended with the statement that "Efforts to complete [the ILC] financing are continuing, and Memorex anticipates that such financing will be completed during the month of December 1970."

On November 24 the NYSE resumed trading in Memorex.

## REVISED NINE-MONTH REPORT (Dated December 15, 1970).

This financial statement excluded sales to ILC and thus reflected a net income of $2,513,000 less than that previously reported. In the report Memorex maintained that the accounting method upon which the prior statements were formulated "was . . . appropriate, notwithstanding the contingent financing of ILC upon which payment for its purchase to Memorex is dependent . . .", and that it would be vindicated and used in the final statement for 1970.

## SPITTERS SPEECH (March 9, 1971).

Addressing the New York Society of Security Analysts, Laurence Spitters, President of Memorex, reviewed his company's growth in 1970, acknowledging that part of that growth was attributable to the ILC enterprise.

## PRELIMINARY REPORT AND FINANCIAL STATEMENT FOR 1970 (Dated April 2, 1971).

This statement described the history of the ILC venture and stated that upon recommendation by Arthur Andersen & Co., "Memorex's earnings on its transactions with ILC should be deferred and amortized over a period of 48 months . . . . ."

## FINAL 1970 ANNUAL REPORT (Dated April 14, 1971).

This report expanded upon the April 2 preliminary report. While the tone of the document was optimistic, it fully described the Memorex-ILC arrangement. Net sales and revenues of Memorex of $78,997,000 expressly excluded $42,345,000 billed to ILC.

## THREE-MONTH INTERIM REPORT ENDED MARCH 31, 1971 (Dated May 13, 1971).

This report showed a loss, under the revised accounting method, of $2.3 million for the first quarter, but assured the stockholders that future profits would be enjoyed as the sales to ILC are accounted for under the deferred method mentioned above.

### *Procedural Background*

On July 21, 1971 defendant Memorex consented to a judgment of permanent injunction in an action brought against it by the Securities Exchange Commission in the Southern District of New York, and agreed, without admitting vi-

olation of any law or regulation, to refrain from employing any scheme or device in violation of Rule 10b–5 and the SEC reporting violations. Memorex also consented to submit a revised 6-month 9-K report for the period ending June 30, 1970. The original 6-month report was the first to have used the challenged reporting method.

That action spawned a number of private actions in several states. The cases originally filed in New York were transferred to this District on defendants' motion under 28 U.S.C. 1404(a)(change of venue for convenience of the parties). Other cases from Minnesota, Boston and Los Angeles were subsequently transferred voluntarily by plaintiffs, all of which were assigned to this court under the local related case rule (LR 101 (c)). At last count there were eleven cases before the court, each alleging that the accounting method violated Rule 10b–5. Eight[1] are purported class actions, one (brought by Essex Fund and Salem Fund) is an individual action and two ("Gelband" and "Nance") are primarily derivative suits that have since been consolidated in an amended complaint. All eleven suits allege essentially the same facts to support their respective claims.

Using the pre-trial format suggested in the Manual for Complex and Multidistrict Litigation (1970), all cases were consolidated on March 10, 1972 for purposes of discovery. A steering committee comprised of four plaintiffs' attorneys was established to coordinate the pre-trial activity of the class actions. Discovery in all eleven actions has proceeded on behalf of all plaintiffs by direction of this committee, counsel for Essex and Salem, and General Counsel for Gelband and Nance. At the time of this writing the parties have progressed well into the "second wave" of discovery.

In consideration of today's ruling, it is anticipated that upon completion of discovery, further pre-trial preparation in this litigation will segregate into the three categories described above, with the Essex and Salem case advancing to trial first, followed respectively by the class and derivative trials.

Plaintiffs' motion for a class determination under amended Rule 23 was heard on May 11, 1972 after extensive and highly professional briefing by the parties. The court took the motion under submission and after a review of the points and authorities determined that because of the factual complexity and scale of this case, as well as the unsettled nature of the law in this area, additional material was required before reaching even a tentative decision on the motion. Accordingly, on July 10 the parties were requested to supply the court with the following information: (a) the actual prices of Memorex stock on the New York Stock Exchange from July 31, 1970 to June 28, 1971, (b) the nature and extent of evidence to be presented to establish the "real" value of Memorex stock during the period in question, (c) the number of purchases, their respective number of shares purchased and sold, and the dates of such purchases and sales, between July 31, 1970 and June 28, 1971, and (d) assuming a class were determined, the manner in which class members would be notified under Rule 23(c)(2). Additionally, the parties were asked to supply information regarding the dates of purchases of Memorex securities by each of the named plaintiffs in the class actions. In moving towards its decision, the court was particularly concerned with whether the case was of sufficient substance to justify unleashing the powerful forces which a class determination necessarily produces, whether the named plaintiffs represent the class they purport to represent (and whether, if sub-classes be determined, representatives will be available), and, most importantly,

---

1. Grad, Vinick, Joyce, Ells, Berke, Wolin, Chang, and Woody.

whether the case is manageable as a class action. The responses of the parties to the above request were both thorough and lucid and aided the court inestimably in its ruling on plaintiffs' motion.

### Findings Under Rule 23

To sustain a class action under Rule 23(b)(3) it must appear from the pleadings and supporting papers that the following prerequisites are met: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties well fairly and adequately protect the interests of the class."

Additionally, it must be shown that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Defendants concede that the potential class members (estimated at 60,000) are so numerous that joinder is impractical and that there are some common questions of law and fact. And they do not vigorously argue that the representative parties will not fairly and adequately protect the interests of the class, so far as that requirement is related to the adequacy of counsel, and the court hereby finds that plaintiffs' legal representation is more than adequate. But they do argue that because the various named representatives purchased and sold at different periods during the time in question there is a potentiality of conflict of claims within the class—a question which brings us to the "typicality" requirement of 23(a)(3).

Defendants contend specifically that persons who purchased on the representations of the interim 6- and 9-month reports and sold after the December 15 press release are necessarily at odds with those who purchased *after* the December 15 release, which defendants maintain fully revealed the ILC transaction. But this argument is premised on a belief that the December 15 release *in fact* washed clean all past misrepresentations (if any there were)—a finding the court obviously cannot make prior to trial.[2]

Defendants' principal challenges to the class determination are that 1) the individual issues prevalent in this case predominate over common issues and 2) the reliance, notice and damage elements of the trial render the cause unmanageable as a class action.

These questions are common to large securities cases and before treating them specifically it is helpful to understand the background against which their analysis must take place.

### Use of Rule 23 in Rule 10b–5 Actions

The stirring overture with which amended Rule 23 was introduced to the courts in 1966 has since turned into a rather sour theme of criticism not only by defendants but also by plaintiffs' lawyers who have dealt intimately with the problems of the class action device in large securities and anti-trust cases. The early, glowing estimate of the utility of Rule 23 was expressed in Eisen v. Carlisle & Jacqueline, 391 F.2d 555 (2nd Cir. 1968) ("Eisen II"[3]) at page 560:

"Class actions serve an important function in our judicial system. By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining

---

2. See discussion *infra* regarding the "common nucleus" of the documents in question.

3. For the subsequent history of this case, see pages 101–102 *infra*.

redress for claims which would otherwise be too small to warrant individual litigation."

And in Esplin v. Hirschi, 402 F.2d 94, at page 99 (10th Cir. 1968), the liberal application of its provisions:

[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.

See, also, Siegel v. Chicken Delight, 271 F.Supp. 722 (N.D.Cal.1967); Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y. 1968).

While solving some of the practical inefficiencies for which it was designed, however, the Rule has created others. One of the foundations of the rule, for example, is that by its employ thousands of small law suits can be combined and tried at one time. The fault in this rationale is that it presumes the small law suits would otherwise in fact be filed—a presumption oftentimes unwarranted. A policy of too casual or premature application of the Rule encourages plaintiffs to take a chance at litigating an unmeritorious securities case where much can be won and little lost, thereby actually *increasing* federal litigation. Statistical data indicates that indeed the number of securities actions alleging class representation has risen dramatically over the last half decade. Simon,

Class Actions—Useful Tool or Engine of Destruction, 55 F.R.D. 375, 377 (1972). And the perhaps legitimate fear is that the Rule can convert the Federal Judiciary into a "small claims court" without any substantial social benefit. 55 F.R. D. at 377.

An equally undesirous effect of injudicious application of Rule 23 is the encouragement of "strike suits" brought by unscrupulous plaintiffs (or their lawyers) using the class allegations to coerce defendants—who may have good defenses on the merits—to settle for fear of exposure to the mammoth liability which a class action necessarily raises. See Blecher, Is the Class Action Rule Doing the Job? (Plaintiff's Viewpoint), 55 F.R.D. 365 (1972).

Another aspect of the use of Rule 23 which has caused particular distress and rancor in both defendants and the professional bar is the fact that huge recoveries are oftentimes divided in such a manner that 60% to 80% is distributed thinly among the class members and 20% to 40% (regardless of the amount of work actually performed) goes to the successful attorneys. Simon, "Class Actions", *supra*, 55 F.R.D. at 390–391.

The answer to these problems, however, is not to abandon Rule 23 where the stakes are high (it is large cases, after all, for which it is designed), but rather to be more selective in its usage and application.[4]

---

4. Defendants have cited the history of litigation in the case of Dolgow v. Anderson as supportive of its argument that a class should not be determined. That case involved a suit on behalf of shareholders to recover damages caused by defendants' alleged misrepresentations and omissions which caused a synthetic inflation in the value of Monsanto Corporation securities from 1964 to 1966. The district court, after a lengthy and thorough review of the rationale of the use of Rule 23 in 10b–5 claims, refused to pass on defendants' motion, that a class not be determined until a preliminary hearing on the merits was held. 43 F.R.D. 472 (S.D.

N.Y.1968). At the conclusion of that hearing the court determined not only was there absent a sufficient showing of merit in plaintiffs' case to sustain a class determination, there was no showing of any possibility of success. The court asked for and granted defendants' motion for summary judgment without written findings or conclusions. The Court of Appeals reversed and remanded on the issue of the summary judgment on the grounds that there appeared from the record to be facts still in controversy. The ruling on the class action was also reversed on the view, apparently erroneous, that the class was disbanded by the trial court because of its ruling of sum-

In summary, criticism of Rule 23 has been directed primarily at the "indiscriminate certification of class actions". Simon, "Class Actions", *supra,* 55 F.R.D. at 377. Although this court has not preceded the ruling today with a preliminary trial on the merits (a procedure expressly authorized by neither Rule 23 nor Ninth Circuit decisions, and expressly rejected by the Second Circuit in *Eisen III, infra.*), it has determined, with the benefit of extensive briefing and the fruits of the parties' discovery, that plaintiffs' claims are not insubstantial, that indeed on their face they have substantial merit. Moreover, counsel for plaintiffs have exhibited a high degree of diligence, discretion, and good faith in these proceedings and nothing in their prosecution of the case thus far indicates improper or unusually selfish motive in bringing this action. As for attorney's fees, if the case should settle (and the court hereby expresses no opinion as to the likelihood or desirability of settlement), or if a judgment is rendered in favor of plaintiffs, the court will see that counsels' remuneration is proportionate to the work done and not arbitrarily sliced from the total amount of recovery.

In brief, while the court is acutely aware of the shortcomings and potential abuse of Rule 23, certification of a class in this case at this stage is not indiscriminate.

mary judgment. 438 F.2d 825 (2d Cir. 1971). On remand, and after an additional hearing in which evidence fatal to plaintiffs' claim was adduced, summary judgment was tentatively granted (confirmation followed shortly) and the class allegations were stricken because plaintiffs could not show any "substantial possibility" of success on the merits. 53 F.R.D. 664, 686 (S.D.N.Y.1971).

The court agrees that the *Dolgow* experience should be kept in mind, but nothing stated there would prevent a class ruling here; on the contrary, the decisions appear to authorize its maintenance until such time as it becomes unmanageable or, as was the specific finding in

## Common Nucleus

■ Defendants urge that the alleged misrepresentations contained in the various public communications by Memorex over the period from August 1970 to June 1971 are of such widely diverse natures as to prevent the court from determining that the claims of the representatives are "typical" under Rule 23(a) or that the common issues predominate under 23(b)(3).[5] Plaintiffs, on the other hand, argue that the reports, statements and press releases by Memorex "comprize a common and continuous plan, scheme and device, the intent and effect of which was to artificially inflate the market price of Memorex stock by overstating its sales and net income."

It is a rare case that involves but one fraudulent statement by a defendant upon which a plaintiff bases a 10b–5 claim. In most of the reported cases on the subject, the courts have been confronted with a number of alleged misrepresentations by defendants and have decided whether common issues predominated. Generally, they have applied a rather liberal test in this regard. There are situations which militate against such a finding, however, as when the representations are oral (see 3 Loss, Securities Regulations (Supp.1962) at p. 33) or where they were in fact of such diversity that it could not be said that they bear any consistent relationship to each other.

*Dolgow* (but only after extended testimony on the merits), the plaintiffs' claim is deemed to be without sufficient merit as to warrant further anxiety on the part of the defendants. 53 F.R.D. at 686–688.

5. Even if defendants' view of the communications prevailed—as it may yet at a later stage in the litigation—the result would not necessarily defeat a class action, but would rather require the creation of sub-classes clustered about each separate, allegedly fraudulent communication. Cf. Richland v. Cheatham, 272 F.Supp. 148 (S.D.N.Y.1967).

But where a "common nucleus" within the several misrepresentations can be discerned, the requisite showings of typicality and predominance of common issues can be made. Harris v. Palm Springs Alpine Estates, 329 F.2d 909 (9th Cir. 1964); Green v. Wolf, 406 F.2d 291 (2d Cir. 1968); Esplin v. Hirschi, *supra*; Siegel v. Chicken Delight, Inc., *supra*; Katz v. Carte Blanche Corp., 52 F.R.D. 510 (W.D.Pa.1971); Berland v. Mack, 48 F.R.D. 121 (S.D.N.Y.1969); Herbst v. Able, 47 F.R.D. 11 (S.D.N.Y.1969); Dolgow v. Anderson, *supra*; Tischer v. Kletz, 41 F.R.D. 377 (S.D.N.Y.1966); Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D.N.Y.1966). In Esplin v. Hirschi, *supra*, for example, defendants orally solicited plaintiffs' purchase of certain stock needed to capitalize a real estate venture. After the purchase defendants disseminated several letters, notices, and statements to the plaintiffs over a one year period. Concealed in both the oral and written communications were facts regarding the rights, privileges and preferences of the various classes of securities and the manner in which the resources of the corporations would be applied if the funds obtained from the issuance of the stock were insufficient or the corporation were unable to engage in its proposed activities. 402 F.2d at 96–97. The court noted that while it was likely the oral representations varied among the plaintiffs, the "complete failure to disclose any material facts . . . was necessarily common to all shareholders." 402 F.2d at 100. The court then reversed the trial court's denial of a class action, stating that it had applied a too restrictive interpretation of Rule 23.

In Green v. Wolf, *supra*, plaintiff alleged that three prospectuses issued in relation to registration of the stock purchased by plaintiff were misleading. Mr. Green, who sought to represent all those whose purchases were affected by the prospectuses, bought his stock shortly after the issuance of the third prospectus. The court held that he was a proper representative of the class.

"Because it appears that the faulted misstatements alleged in the first two prospectuses were also present in the third prospectus, it would be logical and efficient to permit Green to represent all the purchasers, at least with respect to the common misrepresentations." 406 F.2d at 299.

Perhaps even more apposite to the facts alleged here is the case of Fischer v. Kletz, 41 F.R.D. 377, where the alleged misrepresentations followed a pattern similar to those of Memorex. In *Fischer* fifteen actions were consolidated and ruled appropriate for a class action. Plaintiffs alleged that at least seven financial statements issued over a two year period falsely overstated the company's earnings. The class was comprised of all those who purchased the securities during the relevant time period and was certified on the court's conclusion that "[a]lthough the data contained in the various statements were necessarily different, they were *interrelated* and *cumulative* and all purported to represent the financial position of Yale at the times of issuance." 41 F.R.D. at 382 (emphasis added).

The present case is akin to those above. The primary issue in this action is whether Memorex's accounting methods used in the relevant reports, statements and releases conform with generally accepted accounting principles. The August and November Reports and Financial Statements unequivocally characterized "sales" to ILC as revenue. The November 20 press release responded to the criticism of the reporting method which appeared in the Wall Street Journal and plaintiffs have alleged that this release defended the method with respect to ILC and should therefor be considered as another link in the chain of alleged misrepresentation. Similarly, the December 15 9-Month Statement, the Spitters speech and, giv-

ing plaintiffs the tentative benefit of the doubt, the April 2, 1971 Preliminary Report and Financial Statement for 1970 can be said to interrelate with the earlier statements.

However, neither the April 14th Final 1970 Annual Report nor the Three-Month Interim Report Ended March 31, 1971 can be reasonably described as part of this progression.

■■ Although the court must focus primarily on the class action allegations as they appear in plaintiffs' complaints and moving papers, it cannot ignore the very documents issued by defendants upon which liability purportedly rests. While all of the public communications up to April 14 are perhaps susceptible to at least a suspicion of fraudulent content, the court has difficulty understanding plaintiffs' assertion that those who purchased after the April 14 Final Statement are in the same boat as those who purchased before that date.[6] The Final 1970 Statement appears even to the unsophisticated to explain the ILC transaction in the candid manner plaintiffs assert was lacking in the earlier documents. It does virtually everything but admit liability for the prior statements, which the court believes unnecessary to remove the alleged taint of earlier statements and releases. Without indulging in a precipitous analysis of the merits of this case, the court holds that the Final 1970 Annual Report is of such a strikingly different nature than the earlier reports that, even if it is fraudulent in some other way, it cannot be considered part of the alleged "common and continuous" plan to defraud, and that those who purchased after April 14 are not members of the class at this time. Cf. Mitchell v. Texas Gulf Sulphur, 446 F.2d 90, 103 (10th Cir. 1971). This ruling, of course, is subject to modification, and if plaintiffs at a later stage convince the court that there are indeed other common factors indicating liability that transcend the ostensibly disparate reports, the class can be enlarged accordingly. As it stands presently, however, nothing done by Memorex after April 14 can be considered, for purposes of the present ruling, a continuation of the fraudulent conduct.

In summary, the court, after reviewing copies of the documents in question and upon plaintiffs' allegations as they appear in the pleadings, finds that a common nucleus is apparent within the August 3, 1970 through April 2, 1971 communications herein discussed and that plaintiffs' claims are therefor typical of the class and that no material differences exist as would justify a finding that individual issues predominate.

### Reliance

■ Defendants argue that in order to recover, each of the potential 60,000 class members must prove he actually relied on the defendants' alleged misrepresentations and omissions in making his decision to purchase Memorex stock during the relevant time period. Upon this premise, defendants further urge that due process requires they be given the opportunity to depose and cross-examine each class member.[7] If the court were to accept this argument, it is apparent the cause would fail as a class action for two reasons; first, the individual questions of actual reliance would predominate over common questions and, second, the case would be rendered totally unmanageable, thus preventing findings under 23(b)(3) necessary to certify the class.

Courts have grappled in various ways with the serious question of whether the reliance element in 10b–5 claims should be allowed to defeat what would other-

---

6. And their selection of June 24 as the closing date can only be described as arbitrary.

7. Conducted in this manner, defendants estimate the trial would take 60 years to complete.

wise qualify as a class action.[8] One *modus operandi* of common usage is that introduced in the case of Kronenberg v. Hotel Clinton, Inc., 41 F.R.D. 42 (S.D. N.Y.1966) and adopted by the Second Circuit in Green v. Wolf, 406 F.2d 291 (2d Cir. 1968). There the court ordered bifurcation of the 10b–5 action, allowing the class action to proceed on the common questions (e. g., wrongfulness and materiality of the alleged misrepresentations), and postponing if necessary trial of the reliance issue as to each individual plaintiff to a subsequent stage should the above elements of liability be found. This approach has found acceptance in a number of security fraud cases. See Herbst v. Able, *supra*; Mersay v. First Republic Corp. of America, 43 F.R.D. 465 (S.D.N.Y.1968); Siegal v. Realty Equities Corporation of New York, 54 F.R.D. 420 (S.D.N.Y.1972). The logic compelling this course was expressed in Green v. Wolf Corp., *supra*, at 301:

> "[I]f [defendant] is correct in its assertion of the need for proof of reliance, and we express no views on that issue, we must still reject the argument. Carried to its logical end, it would negate any attempted class action under Rule 10b–5, since . . . reliance is an issue lurking in every 10b–5 action."

Use of the bifurcation method, however, does not resolve what appears to be an inherent conflict between proof of the reliance element of a 10b–5 action and the "predominance of common issues" requirement of Rule 23(b)(3); it merely *delays* resolution of the problem until a later date. But this delay in effect prohibits the court from affirmatively finding that the cause is *manageable* as a class action as required by Rule 23(b)(3)(D). That is, if actual individual reliance in its common law sense need be proved by each class member, the trial of that issue, even at a later stage in the proceedings, would tax the court's (and counsels') resources to an intolerable extent. Accordingly, the court is constrained to deal with the reliance enigma at the outset in making its determination of whether a class should be certified.

To grasp the full import of this issue it is necessary to understand that in deciding whether individual reliance is essential to a 10b–5 action, one is deciding the larger question of whether Rule 23(b)(3) is available in an action alleging securities fraud in the stock exchange context.

In brief, the countervailing arguments on the issue are these: Plaintiffs argue first that Rule 23 is designed to improve judicial efficiency by preventing multiplicity of litigation, that this policy is served where thousands of shareholders have been defrauded by the same defendant or defendants, and that there is no reason why a fraud case is unsuitable for a class determination if the claim alleged is based on " 'a fraud perpetrated on numerous persons by the use of similar misrepresentations', thereby rendering it 'an appealing situation for a class action . . . .' Advisory Committee's Note to New Rule 23, 39 F.R.D. 98, 103 (1966)." Segal v. Realty Equities Corporation of New York, *supra*, 54 F.R.D. at 425.

A second reason for determining a class in a securities fraud case of this nature is that "the ultimate effectiveness of [the security anti-fraud laws] may depend on the applicability of the class action device." Loss, Securities Regulations, 2d ed. 1961, p. 1819.

> "In our complex modern economic system where a single harmful act may result in damages to a great many people there is a particular need for the representative action as a device for vindicating claims which, taken in-

8. For a survey of these decisions, see Note, The Impact of Class Action on Rule 10b–5, 38 U.Chi.L.Rev. 337.

dividually, are too small to justify legal action but which are of significant size taken as a group. In a situation where we depend on individual initiative, particularly the initiative of lawyers, for the assertion of rights, there must be a practical method for combining these small claims, and the representative action provides that method. . . . The usefulness of the representative action as a device for the aggregation of small claims is 'persuasive of the necessity of a liberal construction of . . . Rule 23.'" Escott v. Barchris Construction Corp., 340 F.2d 731, 733 (2d Cir. 1965), cert. den. sub nom., Drexel & Co. v. Hall, 382 U.S. 816, 86 S.Ct. 37, 15 L. Ed.2d 63 (1956).

Defendants, on the other hand, argue that application of the class action rule in a 10b–5 "fraud on the market" case necessarily alters the substantive element of a claim by eliminating defenses against those plaintiffs who did not specifically rely on the alleged misrepresentations.

In this court's view the resolution of this conflict lies in a construction of the reliance element which preserves the class action procedure in large securities case while protecting defendant's substantive rights. As will be shown, the question is not really whether the reliance issue is to be embraced or discarded totally; reliance *is* an integral element in a 10b–5 action. The still open question is what kind and quality of reliance must be proved before recovery by class members in a securities case is allowed.

The elements required to be proved in a 10b–5 claim derive from common law fraud. Kohler v. Kohler, 208 F.Supp. 808 (E.D.Wis.1962). But the legislative policy behind Section 10 of the Securities Exchange Act would not be served by fettering shareholder plaintiffs to the strict requirements of proof necessary to recover in a traditional common law fraud action. Speed v. Transamerica

Corp., 99 F.Supp. 808, 831 (D.Del.1951); Norris & Hirshberg v. S. E. C., 82 U.S. App.D.C. 32, 163 F.2d 689 (1947). In recognizing this point courts have endeavored to adapt the substantive elements of the Section to the realities of modern day securities transactions.

 Thus, while material misrepresentations must of course still be proved to support a claim, scienter on the part of the defendant need not be shown. Royal Air Properties v. Smith, 312 F.2d 210 (9th Cir. 1962). Similarly, while some sort of reliance on the part of the plaintiff still must be proved, it appears that reliance of the actual, subjective, individual nature necessary in the classical fraud case would unnecessarily encumber large 10b–5 actions and thereby thwart the Congressional interest in providing a means by which investors may recover against market manipulators in federal court. In the stock exchange context (as opposed to closely held stock sold and purchased in a face-to-face transaction) the interest of Congress in seeing that the integrity of the market is preserved is even greater.

The parties herein cite numerous cases reported from the Second Circuit to support their respective positions on the reliance issue. Defendants rely principally on List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). There, directors of the defendant corporation failed to disclose that they were engaged in negotiations to sell the corporation to Hat Corporation. Plaintiff sold his shares in Fashion Park subsequent to the decision by the directors to sell but before the transaction was consummated. Some directors purchased Fashion Park stock during this period. The court held that the directors were under a duty to disclose the fact that the sale was imminent and that the failure to disclose was material in that the information, if disclosed, would have influenced a reasonably prudent investor in his decision to buy or sell.

340 F.2d at 462–463. The court added that the plaintiff in the "total non-disclosure" situation, in order to recover, need not "prove he actively relied on the silence of the defendant, either because he consciously had in mind the negative of the fact concealed, or perhaps because he deliberately put his trust in the advice of the defendant." 340 F.2d at 463. But in making further observations with respect to the reliance element, the *List* court went outside the facts presented therein and stated that in an affirmative misrepresentation situation it must be shown the plaintiff relied on the defendant's statement. 340 F.2d at 462. Looking to the authorities on common law fraud,[9] the court wrote "[t]he reason for [the reliance] requirement . . . is to certify that the conduct of the defendant actually *caused* the plaintiff's injury." (*Ibid.* 340 F.2d at 462) (emphasis added).

It should be noted that in *List* the suit was brought by a single plaintiff. It was not a class action, nor was it alleged that a substantial number of investors suffered by defendant's actions. In that context, the application of a strict common law reliance requirement is clearly justified: if the plaintiff cannot show he would have acted differently if disclosure had been made (that the nondisclosure *caused* his injury) it would be unfair to allow his recovery. Upon inspection, almost universally the cases cited for the proposition that individual reliance need be proved deal with similar fact situations, where a single plaintiff sues, often for damages originating in a face-to-face transaction Kohler v. Kohler, *supra;* Errion v. Connell, 236 F.2d 447 (9th Cir. 1956); Robinson v. Cupples Container, Inc., 316 F.Supp. 1366. But see Cannon v. Texas Gulf Sulphur, 47 F.R.D. 60 (S.D.N.Y. 1969) at 64, where the unequivocal statement, "Of course, reliance . . .

will have to be proved by each member of the class . . . .", appears without comment on the effect of that ruling on manageability. (Significantly, however, the reliance element did not defeat the determination of a class at that stage.)

In recent years a more realistic definition of the reliance requirement has evolved, the use of which permits huge securities cases to proceed under Rule 23(b)(3), yet assures fairness to the defendant. By use of an objective standard of reliance, focusing on a "causal nexus" between the alleged misstatements and an inflated price upon which plaintiffs relied, the court (and jury) is freed from the overwhelming task of examining the subjective intent of each class member in his decision with respect to his stock.

This approach to the reliance element is not as revolutionary as defendants warn, nor does it destroy substantive rights as they have been defined in past decisions. As noted above, even in common law fraud actions, it is *causation* that is the basis of what we refer to as reliance.

In *List* itself the court's central concern was over the materiality and fraudulent content of the alleged misconduct and whether it would have likely *caused* a reasonable man to act upon it.

The Ninth Circuit decisions on this point do not support defendant's view of reliance, but rather appear to also stress the materiality requirement and remain silent on the individual reliance question. In Royal Air Properties v. Smith, *supra*, the court stated:

"In an action brought under section 10(b) common law fraud need not be alleged or ultimately proved. After establishing the use of some means of interstate commerce, . . . Rule 10b–5 . . . only requires proof of a material misstatement or an omission of a material fact in connec-

9. Restatement, Torts § 546 (1938); Prosser, Torts 550 (2nd ed. 1955); I Harper & James, Torts 583–84 (1956).

tion with the purchase or sale of any security to make out a prima facie case." 312 F.2d at 212.

■ Reliance, *per se*, was not dealt with in the *Royal Air* opinion. In Northwest Paper Corp. v. Thompson, 421 F.2d 137 (9th Cir. 1969), relied on by defendants herein, the court granted summary judgment for the defendant on the ground that the alleged omissions by defendant were immaterial and that a *reasonable man* would not have relied on them, had they been disclosed. Again, the question of individual reliance was not dealt with specifically. In Robinson v. Cupples Container Corp., *supra*, it was held, largely on the *List* decision, that to state a claim under Rule 10b–5 "[t]he action on defendant's part . . . must have been relied upon by plaintiff when he entered the transaction." 316 F.Supp. at 1362, 1366. But the opinion is directed to a discussion of a "causal nexus" between the misrepresentations and the injury and nothing in the instant ruling is inconsistent with the principles enunciated therein. See 316 F.Supp at 1364–1365. If it is demonstrated that the Memorex documents materially misrepresented the financial status of the corporation and that the market responded thereto in a manner that the stock can be said to have been "inflated", and that it was reasonable for an investor to rely thereon, then a sufficient showing of a causal connection between the misrepresentations and the purchases by class members will have been made. In the words of the court in Herbst v. Able, *supra*:

"The question of reliance, itself, may well be one of those claims typical of the claims of the entire class. In a class action it is obviously unnecessary to call every member of the class to prove a typical claim. Plaintiffs may be able to prove that it is more likely than not that the class relied on the statements." 47 F.R.D. at 20.

If these showings can be made by the representative plaintiffs at trial, then it is not unfair to the defendants to require them to compensate class members whose stock plummeted to its "real" value when full disclosure was finally made.

### *"Eisen III"*

Subsequent to the submission of this motion to the court the Second Circuit issued its ruling in Eisen v. Carlisle & Jacqueline, 479, F.2d 1005 (2d Cir., 1973), ("Eisen III") reversing the district court's certification of a class. Because of the potential significance of that decision on the issues at bar, the court requested additional briefing by the parties. After a careful review of the decision and the supplemental memoranda of law, and for the reasons below, the court is of the opinion that *Eisen III* is clearly distinguishable from the present case.

The *Eisen* case involved an antitrust action against odd-lot brokers and dealers for fixing commissions on odd-lot sales. Plaintiff Eisen purported to represent what was first estimated to be "hundreds of thousands" of class members who made purchases from 1962 to 1966. The class ultimately grew to over 6,000,000 investors who dealt in over a billion shares of stock. Damages of over $120,000,000 were sought.

The district court (Tyler, J.) dismissed the cause as a class action on the grounds that given the overwhelming number of potential members and their diversity of interest the action was unmanageable with regard to the notice requirement of Rule 23 and Eisen, alone, was an inadequate representative. (41 F.R.D. 147, 150 (S.D.N.Y.1966). That ruling was held appealable by the Second Circuit (370 F.2d 119 (1966), cert. denied 386 U.S. 1035, 87 S.Ct. 1487, 18 L. Ed.2d 598 (1967) *("Eisen I")*), and was

subsequently reversed. (391 F.2d 555 (1968) ("Eisen II")). In the latter decision the court approved in principle the use of the class action device to vindicate ". . . claims which, taken individually, are too small to justify legal action but which are of significant size if taken as a group," (Eisen II at p. 563), but observed that because of the unusual dimensions of the case it might be found, after further discovery, that the cause was indeed unmanageable and too costly as a class action. (Then) Chief Judge Lumbard dissented, arguing that the record as it stood justified Judge Tyler's original dismissal. *Eisen II* at p. 570. The appellate court, retaining jurisdiction, directed the district court to make findings with respect to the issues of notice, manageability and of Eisen's ability to adequately represent the class. Upon remand, Judge Tyler certified the class on the findings that Eisen was a proper representative and that under the "fluid recovery" method (discussed *infra*) the assessment of damages and distribution of the award were practicable. The court also ruled that the notice requirement of Rule 23(c)(2) could be met by mailing individual notice to 5,000 of the 2,000,000 identifiable class members and giving notice by publication to the remainder. Noting that if the expense of notice in the first instance were placed upon plaintiff the litigation, as a practical matter, would come to an abrupt termination, the court reserved its decision as to allocation of the cost of notice pending a preliminary evidentiary hearing on the merits of the claims, with the idea that the parties would bear the expense of notice in proportion to what the court found to be their respective chances of ultimate success. (52 F.R.D. 253 (S.D.N.Y.1971)). The parties then submitted evidence in the form of affidavits and documents and the court found that the plaintiff class was "more than likely to prevail" on both the antitrust and 10b–5 claims and ordered defendants to bear 90% of the cost of notice to the class. (54 F.R.D. 565, 567 (S.D.N.Y.1972)).

It is the district court's 1971 decision which was reversed in *"Eisen III"*. The court there held that: (1) the "fluid recovery" method of assessment and distribution of damages was impermissible in a private antitrust suit [10]; (2) Rule 23 and the Due Process Clause require actual individual notice to *all* identifiable class members [11]; (3) Eisen's unwillingness to pay the cost of notice was alone a sufficient reason for dismissal [12]; (4) even "preliminary" adjudication of the merits prior to trial for the purpose of allocating the cost of notice does violence to the concept of summary judgment and the provisions of Rule 23(c)(1).[13] The court concluded that the unavailability of the sample notice and fluid recovery innovations rendered the cause unmanageable as a class action.[14]

It is certain that the *Eisen* odyssey will have a substantial effect on future applications of Rule 23. Its impact on the instant litigation, however, is limited and prospective. Aside from whatever philosophical differences exist between the Second and Ninth Circuits with regard to the class action procedure [15] (see, e. g., Harris v. Palm Springs Alpine Estates, *supra*), the practical problems presented in the present litigation, while substantial, are simply not of the

10. *Eisen III*, 479 F.2d at 1013.

11. Id. at 1015.

12. Id. at 1009.

13. Id. at 1016.

14. Id. at 1016–1018.

15. In fact, one need look no further than the Second Circuit itself for a dramatic divergence of opinion on the subject. See Eisen v. Carlisle & Jacqueline, 479 F.2d 1005 (2d Cir. 1973), denying plaintiff's petition for rehearing *en banc*.

same magnitude as those which caused Judge Tyler to resort to the novel procedures disfavored by the Court of Appeals. In *Eisen* the size of the class grew from thousands, to 3,700,000, to over 6,000,000 members, four million of whom could not even be identified. Here, the defendants estimate the size of the purported July 1970 to June 1971 class to be about 60,000 (or 1% the size of the *Eisen* class). That figure has already been reduced as a result of the court's limitation of the class to those who purchased before April 14, 1971. Defendants have advised the court of their intention to move for summary judgment as against plaintiffs who purchased during specific periods within the class period. If they prevail, the class surviving at the time of trial will be diminished even further. Moreover, it is anticipated that virtually all members can be identified.

Plaintiffs here, unlike Mr. Eisen, are willing to bear the full expense of identifying and notifying class members. Plaintiffs have not urged, nor would the court accept, the random notice technique criticized in *Eisen III*; upon completion of discovery notice shall be effected as to all identifiable class members.

The mechanics and timing of notice will require a separate hearing. At his point, however, it is noted that the method of notice used in Berland v. Mack, *supra,* appears to be a useable model for the instant litigation. There, identification of most of the class members was made with the assistance of broker transfer lists, first class mail was used to notify those purchasers, and notice by publication was deemed adequate for the remainder. See Berland v. Mack, *supra,* 48 F.R.D. at 129–130; State of West Virginia v. Chas. Pfizer Co., 314 F. Supp. 710, 724–740 (S.D.N.Y.1970).

A crucial, perhaps dispositive finding in *Eisen III* was that the average recovery by a class member would amount to about $3.90 and that the cost of giving notice to the class and of administering the allocation of damages would, on a per capita basis, have almost equalled that amount, rendering the whole arduous affair destined ultimately for little more than a moral victory, assuming plaintiffs prevailed on the merits. *Eisen III,* 479 F.2d at p. 1017. Here, it is estimated by plaintiffs, albeit in a somewhat arm-waving fashion, that the average recovery would be over $4,000 per member. Even if the recovery is significantly less than that, it appears that it would not be exceeded by the cost of administration.

Finally, the court finds that recovery of damages, if liability is found, can be managed without resort to the "fluid recovery" method. While the court looks with concern upon the prospect of burdening a jury with the task of analyzing the damages to each class member even with the assistance of a master, it must be kept in mind that that task need not be assumed unless and until the issue of liability is resolved in favor of the plaintiffs. (Green v. Wolf, *supra*; Berland v. Mack, *supra,* 48 F.R.D. at 126). By that stage in the litigation, as mentioned above, the numbers of plaintiffs and trading days may well have been further diminished by rulings on the law. And if liability *is* found, it is unquestionable that the court has the duty to see that wronged shareholders recover. To deny a class determination on the ground that the computation of damages might render the cause unmanageable would encourage corporations to commit grand acts of fraud instead of small ones with the thought of raising the spectre of unmanageability to defeat the class action. The court does not deceive itself in believing that this task will be easy; it does believe, however, that justice requires it be attempted.

In short, this cause can and should proceed as a class action without adversely affecting defendants' substantive rights or resorting to the "fantastic pro-

cedure[s]" devised in an effort to make manageable an inherently unmanageable class action. *Eisen III* warns that cases, particularly those involving literally millions of potential class members, should not be maintained as class actions at any cost. But the court also acknowledged that ". . . amended Rule 23 provides an excellent and workable procedure in cases where the number of members of the class is not too large." *Eisen III*, 479 F.2d at p. 1019. Manageability is a practical question and must obviously be dealt with on a case-by-case basis. At the present time the class defined in this memorandum appears to be of manageable size.

### Conclusion

For the reasons above, the court finds that the common issues of 1) the existence, character and materiality of the alleged misrepresentations. 2) whether the market was artificially inflated, and 3) whether the inflation would likely have caused the reasonable investor to purchase Memorex stock predominate over the individual issues presented in this action. The court also finds that a class action is superior to all other available methods for the fair and efficient adjudication of the controversy.

The class is defined for the present as all those who purchased Memorex securities on the open market between July 31, 1970 and April 14, 1971 and suffered a loss as a result of the defendants' alleged misstatements and omissions.

Plaintiffs' motion for a class determination has been argued exclusively in terms of the claims based on the Securities Exchange Act of 1934 and the rules promulgated thereunder. Accordingly the present ruling is limited to those claims and the causes of action based on state law shall proceed individually.

It is therefor ORDERED that the eight cases designated above be consolidated for all purposes and proceed as a class action under the direction of the previously assigned steering committee.