Norris L. FRIEDLANDER, Plaintiff,

v.

John R. BARNES, Preston A. Peak, George S. Rooker and Dorchester Gas Corporation, Defendants.

No. 84 Civ. 533 (RLC).

United States District Court, S.D. New York.

Sept. 20, 1984.

Pomerantz, Levy, Haudek, Block & Grossman, New York City (Robert B.

Block, New York City, of counsel), for plaintiff.

Willkie, Farr & Gallagher, New York City (Stephen Greiner, James J. Calder, Arthur S. Gabinet, New York City, of counsel), for Dorchester Gas Corp.

Skadden, Arps, Slate, Meagher & Flom, New York City (Kurt Koegler, Neil Karbank, Gwen Feder, New York City, of counsel), for Barnes, Peak and Rooker.

## OPINION

ROBERT L. CARTER, District Judge.

Norris L. Friedlander brought this suit under sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5. The matter is presently before the court on his motion for class certification.

Plaintiff alleges that the senior management of defendant Dorchester Gas Corporation ("Dorchester") began considering a leveraged buy-out of the company in mid-August, 1983. In early November, they retained the investment banking firm of Morgan Lewis Githens & Ahn to assist them. Nevertheless, on November 15, 1983, Dorchester issued a proxy statement which contained a declaration that "[t]he Board of Directors has no knowledge at the present time of any specific effort to accumulate the Company's securities or to obtain control of the Company." Plaintiff asserts that this statement was materially false and misleading. On November 22, plaintiff sold 1,500 shares of Dorchester common stock at the market price of $12.75 per share.[1] It is his contention that this market price was lower than it would have been if the proxy statement had revealed management's efforts to engineer a leveraged buy-out.

Trading in Dorchester stock was halted on December 1, 1983. On December 2, defendant George S. Rooker, chairman and chief executive officer of Dorchester, announced that Dorchester's Board of Di-

rectors had unanimously approved the acquisition of the company in a transaction in which the stockholders would receive $22.50 cash per share. The purchase was "to be made by one or more newly formed, privately owned corporations in which the senior management of Dorchester and partners of Morgan Lewis Githens & Ahn will have a significant equity interest." When trading was resumed on December 5, Dorchester stock rose to $20.375 per share. Plaintiff maintains that Dorchester stock would have sold at this December 5 price as of November 15 if the proxy statement had not been misleading.

### I

■ Plaintiff seeks leave to sue on behalf of all those who sold Dorchester stock between November 15, 1983, the date on which the proxy statement was issued, and November 30, 1983, the last day prior to the announcement of the leveraged buy-out on which Dorchester stock was traded. Although defendants object to the scope of the proposed class, they concede the propriety of maintaining the suit as a class action. The court agrees that the requirements of F.R.Civ.P. 23(a) and (b)(3) have been met in this case.

Plaintiff alleges that over 900,000 shares of Dorchester common stock were sold by hundreds, or perhaps thousands, of people between November 15 and 30, 1983. The joinder of all such persons is manifestly impractical and the "numerosity" requirement is therefore satisfied. F.R.Civ.P. 23(a)(1); *see In re Victor Technologies Securities Litigation*, [Current] Fed.Sec.L. Rep. (CCH) ¶ 91,433 at 98,150 (N.D.Ca. April 4, 1984); *McFarland v. Memorex Corp.*, 96 F.R.D. 357, 361 (N.D.Ca.1982). Plaintiff's inability at this time "to state the exact number or to identify individually every member of the class does not militate against the maintenance of a class action." *Herbst v. Able*, 47 F.R.D. 11, 21 (S.D.N.Y. 1969) (Motley, C.J.).

---

**1.** Dorchester common stock is traded on the American Stock Exchange.

The central questions of law and fact posed by this litigation are common to all class members. They include whether the proxy statement contained a materially false and misleading statement; whether defendants acted with *scienter*; and whether as a result of the proxy statement Dorchester stock was artificially undervalued. F.R.Civ.P. 23(a)(2); *see Green v. Wolf Corp.*, 406 F.2d 291, 299–300 (2d Cir.1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Pellman v. Cinerama, Inc.*, 89 F.R.D. 386, 389 (S.D.N.Y.1981) (Sofaer, J.). Moreover, where, as here, a single written document is alleged to be materially false and misleading, the common questions predominate over those affecting only individual class members. F.R.Civ.P. 23(b)(3); *see Korn v. Franchard Corp.*, 456 F.2d 1206, 1212 (2d Cir.1972).

Plaintiff's claim that the misleading proxy statement had depressed the price of Dorchester stock at the time he sold his shares is typical of the claims of all class members. F.R.Civ.P. 23(a)(3). In fact, it is substantially identical to those claims. Although some class members sold before and some after plaintiff, some fewer and others a greater number of shares, all class members' claims are based upon the same alleged unlawful conduct by defendants and all class members look to the same legal theory to justify recovery. *See Dura-Built Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y.1981) (Edelstein, J.). No conflict between plaintiff and the absent class members is apparent and the conduct of the litigation to date raises no other question as to plaintiff's adequacy as a class representative. Similarly, there is no indication that plaintiff's counsel will prosecute the case other than in a competent, professional manner. F.R. Civ.P. 23(a)(4). *See Dura-Built v. Chase Manhattan Corp., supra* at 100–01.

Finally, it is well settled that a class action is the best, if not the only practicable method of adjudicating a 10b–5 case involving a large number of relatively small transactions on a national securities exchange. *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, [1975–76] Fed.Sec.L.Rep. (CCH) ¶ 95,377 at 98, 887 (S.D.N.Y. Dec. 9, 1975) (Tenney, J.). The great majority of class members no doubt have claims "too paltry to justify individual litigation." *Id.* In addition, nothing presently before the court indicates that the prosecution of this essentially straightforward case as a class action will pose difficult problems of management. *See Weiss v. Drew National Corp.*, 71 F.R.D. 429, 431 (S.D.N.Y.1976) (Stewart, J.). Thus, a class action is superior to any other available method for adjudicating this controversy. F.R.Civ.P. 23(b)(3).

## II

The only substantial question presented by this motion is whether, as defendants argue, the plaintiff class should be restricted to those who sold Dorchester stock between November 15 and 23, 1983. On November 25, Dorchester asked the American Stock Exchange to delay the opening of trading in its stock.[2] That morning, Dorchester issued a press release which read in relevant part:

Dorchester Gas Corporation said today that it has received a number of inquiries relating to unusually active trading and price movement of its stock on the American Stock Exchange on Wednesday, November 23rd. George S. Rooker, Chairman and Chief Executive Officer, said he did not know the reason for the unusual activity but that over a period of years Dorchester has often been the subject of unconfirmed rumors.

Mr. Rooker said he was aware that a private company was attempting to arrange financing for a possible leveraged buy-out of the Company, the terms of which have not been determined. He said that the private company has had discussions with management regarding a participation in such buy-out.

Mr. Rooker said Dorchester has received no offer relating to any acquisi-

---

**2.** The market was closed for Thanksgiving on November 24, 1983.

tion or merger but that it is management's policy that, when and if any firm offer is received, it would be publicly announced. Any offer received would be presented to the Board of Directors for consideration and, if approved, submitted to a vote of the stockholders.

Defendants contend that this press release cured any misrepresentations that may have been contained in the November 15 proxy statement and thus that any market undervaluation of Dorchester stock precipitated by the proxy statement was eliminated as of that date. Defendants conclude that those who sold between November 25 and the announcement of the leveraged buy-out on December 2 should be excluded from the class.

Defendants frame the issue as a question of "typicality", arguing that plaintiff, who sold before the November 25 press release, has a claim which is not typical of the claims of those who sold thereafter. But it is plain that this argument is only as strong as the underlying premise that the press release actually did cure the misrepresentations in the proxy statement and the resultant undervaluation of Dorchester stock. Defendants point to no other distinction between pre-and post-November 25 sellers, both groups claim a common injury and common legal basis of recovery, and thus if the November 25 press release did not cure the November 15 violation, there are no grounds for closing the class as of the former date.

Plaintiff argues that any inquiry into the curative effect of the November 25 press release would amount to a pre-certification evaluation of the merits of the case, a procedure expressly rejected by the Supreme Court in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). The *Eisen* court held that it was inappropriate to consider the merits in connection with a motion for class certification. Rather, the Rule 23 determination must be made prior to any examination of the merits. Defendants respond that nothing more than a comparison of the misrepresentations alleged in the complaint and the disclosures made in the November 25 press release is required to conclude that the latter cured the former.

If the comparison defendants suggest did, in fact, show that no substantial question exists as to the curative effect of the press release, *Eisen* would not stand in the way of narrowing the scope of the class. The nature and extent of the pre-certification inquiry a district court may conduct without running afoul of *Eisen* is problematic, *see In re LTV Securities Litigation*, 88 F.R.D. 134, 147 (N.D.Tex.1980), but it is clear that the court may look beyond the four corners of the complaint. *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 570–72 (2d Cir.), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982); *Professional Adjusting Systems of America, Inc. v. General Adjustment Bureau, Inc.*, 64 F.R.D. 35, 37 (S.D.N.Y.1974) (Gurfein, J.). Thus, in a number of 10b–5 cases, courts have used curative announcements to define the limits of the class period.

In *In re LTV Securities Litigation, supra*, plaintiffs alleged that the overvaluation of the inventory of J&L Steel, defendant's subsidiary, in a number of public documents, had artificially inflated the market price of defendant's securities. Over plaintiffs' objection, the court ended the class period on the date defendant began a 10 day halt in the trading of its stock and issued a press release stating that adjustments to J&L's inventory value " 'would have a materially adverse impact on the reported results of the operations of J&L Steel and of LTV.' " *Id.* at 147. The court concluded that the press release had clearly alerted the market to the overvaluation of J&L's inventory and that the strong market reaction to the press release proved that it had absorbed the information. Thus, post-press release purchasers had not bought in an inflated market, and were therefore not part of a class whose claim for relief depended upon a "fraud on the market" theory. *Id.* at 147–48. Similarly, in *In re Memorex Securities Cases*, 61 F.R.D. 88 (N.D.Ca.1973), the court closed the class period as of the date of a state-

ment which the court found "appears even to the unsophisticated to explain the [previously misrepresented] transaction in the candid manner plaintiffs assert was lacking in the earlier documents. It does virtually everything but admit liability for the prior statements, which the court believes unnecessary to remove the alleged taint of earlier statements and releases." *Id.* at 97; *see also Cannon and Feeley v. Texas Gulf Sulphur Co.*, 53 F.R.D. 216 (S.D.N.Y.1971) (Bonsal, J.).

The common thread that unites these and similar cases is that in each, the court entertained no substantial doubt as to the curative effect of the document in question. The precipitous inquiry into the merits proscribed by *Eisen* was unnecessary to the court's conclusion. By contrast, in those cases in which additional evidence was required to determine the curative effect of a press release or other document, the class period, at least provisionally, was not limited by that document. In *Sirota v. Solitron Devices, Inc., supra* at 572, the Second Circuit approved the district court's decision not to close a class period as of the date of an allegedly curative press release because at the time of the class certification motion there was a substantial question of fact as to whether the release had cured the market or was itself misleading. The court reasoned in the same fashion in *In re Victor Technologies Securities Litigation*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 91, 433 (N.D.Ca. April 4, 1984), concluding that an examination of "whether a document issued during the proposed class period 'effectively cured' an alleged earlier misrepresentation calls for ... a proscribed inquiry into the merits." *Id.* at 98,152. *See also Fine v. Houston Oil Trust*, [1983–84] Fed.Sec.L.Rep. (CCH) ¶ 99,422 (S.D.Tex. 1983).

The instant case presents a close question. It is incontrovertible that the November 25 press release acknowledged that efforts were being made to finance a leveraged buy-out. This is the key information which plaintiff alleges was misrepresented by the November 15 proxy statement. Moreover, the precipitous rise in the price of Dorchester stock on the last trading day before the press release was issued indicates that the market's adjustment to the news had already begun on the strength of rumors. Nevertheless, on the record before the court, it cannot be said that plaintiff's contention that the press release did not effect a complete cure raises no substantial question of fact. Plaintiff alleges that senior Dorchester management had not merely been approached by an interested buyer, as the press release implies, but had itself initiated the leveraged buy-out plan. According to plaintiff, had this fact been revealed, market traders would have had a more sanguine view of the likelihood of a deal being consummated, and Dorchester stock would have sold at a price higher than it did even after the issuance of the press release. Plaintiff points to the almost 25% jump in the price of Dorchester stock following the December 2 announcement of the leveraged buy-out to substantiate his claim.

However this may be, the matter is not presently so free from doubt as to justify truncating the class. The complaint does allege management's central role in the organization of the buy-out and the press release does not reveal this fully.[3] The significance of this omission is another question, but whatever doubts the court

---

**3.** Paragraphs 6 and 7 of the complaint read as follows:

    6. Dorchester's senior management started exploring a possible leveraged buyout in mid-August 1983.

    7. Early in November 1983, Dorchester's senior management engaged Morgan Lewis Githens & Ahn ("Morgan Lewis"), a New York investment banking firm, to assist in that endeavor.

Defendants argue that plaintiff's emphasis on the role of senior management in the buy-out is merely an "afterthought" seized upon to justify the longer class period despite the clear revelation of buy-out negotiations in the press release. The issue was raised in the complaint, however, and the complaint must be construed liberally in any case. Afterthought or otherwise, plaintiff's point raises an issue going to the merits of the case which is incapable of resolution on this class certification motion.

**422**

may have as to plaintiff's ability to prove a "fraud on the market" which continued after the November 25 press release, the issue is best resolved after further evidentiary development. An attempt to resolve the matter at this point would plainly cross the *Eisen* line.

Further developments in this case may well warrant reconsideration of the scope of the class. Accordingly, the present order is made conditionally. F.R.Civ.P. 23(c)(1). At present, the class is certified as comprising all persons who sold shares of Dorchester common stock between November 15 and November 30, 1983, inclusive.

IT IS SO ORDERED.