**In re U. S. FINANCIAL SECURITIES LITIGATION.**

**SOCIETE GENERALE DE BANQUE et al., Plaintiffs,**

v.

**TOUCHE ROSS & CO., Defendant.**

**Civ. A. No. 74-569-T.**

United States District Court, S. D. California.

Aug. 11, 1975.

See also, D.C., 64 F.R.D. 443.

28

Casey, Lane & Mittendorf, by William E. Kelly, James M. Shaughnessy, J. Lawrence Blades, New York City, and John D. Butler, San Diego, Cal., for plaintiff Societe Generale de Banque.

Gibson, Dunn & Crutcher, by Irwin F. Woodland, John T. Behrendt, Bruce A. Toor, Los Angeles, Cal., for defendant Touche Ross.

## OPINION AND ORDER CONCERN-
## ING THE PROPRIETY OF A
## CLASS ACTION

TURRENTINE, District Judge.

Plaintiffs, Societe Generale de Banque, Rentinvest, North American Fund A and ITF Fund, Ltd., move this Court pursuant to Rule 23(c)(1) of the *Federal Rules of Civil Procedure* for an order determining that this action shall proceed as a class action and, furthermore, that the class plaintiffs seek to represent shall be defined as all holders of 9% Bearer Debentures due April 1, 1982, of U. S. Financial Overseas, N.V.,

which are guaranteed by U. S. Financial, Inc.[1] Defendant Touche Ross & Co. opposes this motion.[2] Upon examination of the motion, and the supporting and opposing briefs, affidavits and exhibits submitted to this Court by plaintiffs and defendant, and after consideration of the oral arguments presented to this Court by the parties on this matter, plaintiffs' motion is granted with modifications.

## I. FACTUAL BACKGROUND

As a corporation organized and existing under the laws of the State of Delaware, USF maintains its principal place of business in San Diego, California. It is the successor corporation to U. S. Financial, which was incorporated under the laws of the State of California in 1962 as West Coast Financial.[3] In 1964, West Coast Financial changed its name to U. S. Financial. Thereafter, in 1972, U. S. Financial created USF, simultaneously underwent a corporate reorganization, and eventually merged itself into USF. By 1964, USF's common stock was registered for the first time with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1933, and listed in the "over-the-counter" securities market for public trading. The stock obtained a listing on the New York Stock Exchange in December 1970 and retained such a status until December 5, 1972, when it was delisted as a result of an order issued by the Securities and Exchange Commission suspending trading in USF securities.

USF is in the business of developing, constructing, operating, marketing, and financing real estate projects, individually and as a participant in joint ven-

---

1. Hereinafter, Societe Generale de Banque shall be referred to as "Societe," Rentinvest as "Rentinvest," North American Fund A as "NAFA," ITF Fund, Ltd. as "ITF," the 9% Bearer Debentures due April 1, 1982, as the "debentures," U. S. Financial Overseas, N.V. as "USFO," and U. S. Financial, Inc. as "USF."

2. Hereinafter, Touche Ross & Co. shall be referred to as "Touche."

3. Throughout the remainder of this opinion, reference to "USF" includes West Coast Financial, U. S. Financial and USF.

tures. Most of the construction and financing of its various real estate developments are controlled directly by USF through a group of subsidiary corporations, such as Guaranty Capital Corp., U. S. Realty Corp., Leasing Services, Inc., and U.S.F. Capital Corp. In addition, USF has wholly-owned subsidiaries in the title insurance business and in the casualty insurance business.

Between 1966 and 1973,[4] USF and its subsidiaries retained Touche as independent certified public accountants to perform annual and semi-annual audits of USF and to prepare and certify annual and semi-annual financial statements for USF. At all times relevant herein, Touche was and presently is one of eight major firms of independent certified public accountants collectively referred to in the accounting profession as "The Big Eight."

In the latter half of 1969, USF embarked upon a program designed to provide it with additional financing from foreign sources through debenture offerings. To accomplish this objective and to avoid various registration requirements of the federal securities laws, USF established on January 1, 1970, USFO, a Netherlands Antilles corporation with its principal place of business in San Diego, California. The stated, actual and sole purpose of USFO was to obtain financing for USF's various real estate activities from sources outside of the United States. Any proceeds derived from the sales of debentures, notes

or other debt-financing were to be transferred immediately from USFO to USF in California. Hence, on April 8, 1970, USFO initially offered its 9% Bearer Debentures due April 1, 1982, in the face amount of $12.5 million.[5] At the time of the offering, the debentures were fully guaranteed by USF and they had warrants for the purchase of shares of USF common stock attached thereto.[6] The debentures are in $1,000 denominations and, as the identification of the debentures indicates, they are "bearer" in nature.[7] Of the original principal or face value of $12.5 million, there presently remains outstanding $11.3 million in debentures; the other $1.2 million have been redeemed.

On July 23, 1973, USF filed a petition for arrangement under Chapter XI of the United States Bankruptcy Act in the United States District Court for the Southern District of California. In its petition, USF asserted that it was unable to meet its financial commitments and that its liabilities were substantially in excess of its assets. In the succeeding months of 1973, USF disclosed that its former management had engaged in a large number of alleged fraudulent transactions over a period of several years, which resulted in the reporting of grossly exaggerated earnings, revenue and income for USF.

Thereafter, it was revealed that, commencing in October of 1972, the Securities and Exchange Commission had conducted an investigation into certain of

---

4. Pursuant to agreements of retainer between USF and Touche, the latter rendered accounting services as independent certified public accountants for USF and its subsidiaries for the accounting periods ending December 31, 1966, through December 31, 1972, except for a period of several weeks from October 1971 to January 1972, when Haskins & Sells performed such services for USF. Among other items, Haskins & Sells prepared and certified USF's consolidated annual and semi-annual financial statements and prepared a "cold comfort" letter, dated April 8, 1970, in connection with the original offering of the debentures.

5. The only other activity in which USFO ever engaged was the offering of short-term notes due 1973 in the face amount of $13.5 million, which were guaranteed by USF.

6. Between April 8, 1970, and July 23, 1973, the debentures and the warrants were publicly traded on the Luxembourg Stock Exchange and through the efforts of an extensive third market in the European banking community.

7. No records of ownership are maintained upon the sale of bearer debentures because a change in their ownership can be effectuated by a transfer of possession.

these transactions and that such investigation ultimately caused the resignation of USF's management in December 1972 and January 1973. Investigations by the Securities and Exchange Commission and by others revealed that USF's former management, under the leadership of Mr. R. H. Walter, had engaged in an alleged fraudulent course of conduct, the result of which was that USF failed to possess the net worth of $40 million that it claimed in its periodic financial statements, which were prepared and certified by Touche. Instead, USF was found to have a negative net worth of $15 million. This extraordinary financial difference required USF's filing of a petition for an arrangement and, in addition, produced a myriad of lawsuits against USF and others by investors in USF securities.

## II. PROCEDURAL BACKGROUND

About February, 1974, the Securities and Exchange Commission instituted an action against USF, its former management and several outsiders alleging that they perpetrated fraud upon the investing public. At the same time, the Commission published a consent decree against Touche, wherein Touche's alleged fraud and gross negligence were recited in part.

Thereafter, plaintiffs commenced this action both by filing their complaint in the United States District Court for the Southern District of New York and by serving the same upon defendant Touche on July 22, 1974.[8] Jurisdiction is predicated upon Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa), federal question (28 U.S.C. § 1331), diversity of citizenship (28 U.S. C. § 1332), and pendent jurisdiction.

All of the plaintiffs are foreign entities that operate abroad.[9] Both Societe Generale de Banque and North American Fund A, a corporation and mutual fund, respectively, are organized and ex-

8. This action came before this Court in the following manner: since eight actions pending in four federal districts involved common factual issues, the Judicial Panel on Multidistrict Litigation transferred them on June 6, 1974, to the Southern District of California pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings with the two actions pending here. The resulting litigation, designated as *In re U. S. Financial Securities Litigation*, 375 F.Supp. 1403 (J.P.M.L.1974), was assigned to this Court for unified pretrial supervision. Three other actions pending throughout the nation subsequently were transferred by the Panel without opposition by conditional transfer orders. Months later, on December 2, 1974, the Panel transferred the *Societe Generale de Banque, et al. v. Touche Ross & Co.* action to this Court for similar processing because it also shared questions of fact common to the previously transferred actions. *In re U. S. Financial Securities Litigation*, 385 F.Supp. 586 (J.P.M.L.1974).

9. Following the collapse of USF, Societe, Rentinvest and NAFA were concerned to learn the facts and to determine what action, if any, was necessary to protect their interests. Accordingly, a representative of these plaintiffs went to the United States to investigate the USF situation. Until that

trip, the plaintiffs assumed that First National City Bank (hereinafter referred to as "FNCB"), as indenture trustee, would commence an action to protect the debenture holders. FNCB, however, informed them through their representative that it, as indenture trustee, had no obligation to institute an action on behalf of any holders of debentures. Consequently, Societe retained counsel in the United States to represent its interests in the USF reorganization proceedings under the United States Bankruptcy Act and to investigate potential lawsuits.

Concurrent therewith, FNCB requested Societe to act as a center in Europe for the dissemination of information to debenture holders, and Societe acquiesced. FNCB then corresponded with holders of debentures known to it and suggested that they contact representatives of Societe for the purpose of arranging a meeting to discuss the plan of arrangement proposed by USF's new management under Chapter XI of the United States Bankruptcy Act. Subsequently, and again at FNCB's suggestion, Societe agreed to host such a meeting for some debenture holders in Brussels, Belgium, on February 18, 1974. At the end of the meeting, there was a brief discussion of possible litigation, and the consensus of those present was that the most logical and feasible action was

isting under the laws of the Kingdom of Belgium, and maintain their principal place of business in that country.[10] Rentinvest is a mutual fund organized and existing under the laws of Luxembourg with its principal place of business in that nation. The final plaintiff, ITF Fund, Ltd., is a corporation organized and existing under the laws of the Netherlands Antilles and has its principal place of business there.[11] In contrast to plaintiffs, defendant Touche is a partnership operating in the United States and maintains its principal place of business in the Southern District of New York.

Plaintiffs are holders of some of the aforementioned debentures, all of which are in default. Of the total principal value of $11.3 million debentures outstanding, plaintiffs purchased and are now holding debentures with the following face values:

| Plaintiff | Amount Purchased | Dates Purchased |
|---|---|---|
| Societe | $755,000 | April 8, 1970 & March 1, 1973 |
| Rentinvest | $603,000 | On various dates between December 10, 1971 & May 1972 |
| NAFA | $174,000 | April 8, 1970 & February 15, 1971 |
| ITF | $697,000 | April 8, 1970 & May 23, 1972 |

Thus, exclusive of potential class members, these four plaintiffs hold debentures with a total principal value of $2,229,000 or approximately 20% of all outstanding debentures.

By this action, plaintiffs seek to recover damages in excess of $18 million for themselves and for all members of

against Touche. Since Societe thus far had taken the lead in informing the debenture holders of the USF reorganization plan and in representing their views in meetings with the USF creditors committee, all present debenture holders requested Societe to act on their behalf in investigating and pursuing such litigation against Touche. On March 6, 1974, Societe wrote to all known debenture holders describing the Brussels meeting, the proposed USF plan of arrangement and the possibility of a lawsuit. Societe also offered to commence that lawsuit as a class action on behalf of all debenture holders provided enough holders agreed to support the action. To date, 77 holders of debentures have agreed in writing to support plaintiffs in this purported class action, each plaintiff to be liable for the costs of this lawsuit up to 5% of their respective financial losses. Together with plaintiffs, these holders possess a total face value of $5,913,000 or 52.33% of the outstanding debentures. Moreover, Societe has the names of other debenture holders who, while not as yet agreeing to support this action, have not affirmatively refused their support. Thus, plaintiffs have the identity of 106 debenture holders who possess a total principal value of at least $6,615,000 or over 58.54% of the debentures outstanding. Furthermore, FNCB has the identities of other debenture holders, but refuses to release these without the permission of the holders, or without an order or a subpoena issued by this Court.

10. Societe, is a major European bank, which has been characterized by one of its "sous-directors" (vice-presidents) as the most important bank in Belgium. Led by Goldman, Sachs & Company, Singer & Friedlander and Banque de Paries et de Pays-Bas, the initial public sale of the debentures was made by an underwriting group that included Societe. This plaintiff either underwrote or sold 2% or $250,000 face value of the debentures in that original offering and collected the usual underwriting and selling commissions for those sales. A portion of those debentures was purchased by NAFA, a mutual fund controlled along with Rentinvest by Societe; the remainder was bought by banks and companies directly related to Societe. Both Societe and NAFA contend that there was no flow of information between the persons at Societe responsible for the underwriting of the USF debentures and the persons at Societe responsible for NAFA's decision to purchase a portion of the debentures.

11. ITF is a mutual fund owned primarily by Europeans. It is controlled and managed by Securities Management Co., which, in turn, is 25% owned by FNCB, the indenture trustee of the debentures, who initially instructed ITF to contact Societe regarding the debentures. An officer of FNCB is a director of ITF and is chairman of the Securities Management Co. parent company.

the class on whose behalf they sue defendant. Generally, the complaint contains allegations that between the years 1966 through 1971 Touche fraudulently and negligently conducted periodic audits of, and prepared and certified as valid annual and semi-annual statements regarding, the financial condition of USF and its subsidiaries, including USFO. In reliance upon the opinions rendered by Touche concerning USF's financial condition, plaintiffs purchased the debentures and, thereby, suffered financial losses.

In their first claim for relief, plaintiffs contend that Touche violated Section 10(b) of the Securities Exchange Act of 1934 by directly and indirectly employing various means and instrumentalities of interstate commerce both to make false and misleading representations of material facts and to omit statements of material facts to the public investing in USF securities. For similar reasons, plaintiffs assert in their second and final claim that Touche is guilty of common law fraud and negligence.

### III. CLASS ACTION CERTIFICATION

#### A. *Rule 23(a) Requirements*

In deciding whether an action should be permitted to proceed as a class action, Rule 23 of the *Federal Rules of Civil Procedure* requires this Court to be convinced that all of the requirements enumerated in subdivision (a) of that Rule —numerosity, commonality, typicality, and representativeness—have been satisfied by the party or parties moving for such a determination. Accordingly, each prerequisite will be examined as it relates to the present situation.

#### 1. "Numerosity"

■ While plaintiffs need only demonstrate that "the class is so numerous that joinder of all members is impracticable" (*Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U. S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Lewis v. Bogin*, 337 F.Supp. 331 (S.D.N.Y.1972); *Weiss v. Tenney Corp.*, 47 F.R.D. 283 (S.D.N.Y.1969); Fed.R.Civ.P. 23(a)(1)), in the instant matter, joinder of all potential plaintiffs is not only impractical but impossible. Of the 11,300 debentures that remain outstanding from the 12,500 debentures purchased, approximately 50% of the debenture holders can be identified by plaintiffs. If compelled to do so by this Court, FNCB, the indenture trustee, can reveal the names of further holders. Nonetheless, since plaintiffs cannot discover the identity of other debenture holders because the debentures are not registered and are of a "bearer" nature, actual joinder of all class members is an impossibility. Even if joinder was possible, such a technique would be both impractical, because there exists well over a hundred holders dispersed throughout Europe and elsewhere, and inequitable, since all of the holders are foreign citizens or residents, some of whom have relatively small purchases that would preclude joinder in an economic sense.

■ Finally, the fact that the precise number of potential members of the class cannot be ascertained does not bar a class action certification. As the court noted in *Herbst v. Able*, 278 F. Supp. 664 (S.D.N.Y.1967), there is no need to state the exact number and identity of every class member because to do so would frustrate the purpose of class actions when recoveries may be numerous but small. Based upon the current identification of allegedly injured debenture holders, there appears to be ample justification for the view that the present lawsuit meets the "numerosity" requirement because joinder of these persons and entities would be impracticable.

#### 2. "Commonality"

The second prerequisite is that questions of law and fact exist common to

the potential class members. *In re Penn Central Securities Litigation,* 347 F. Supp. 1327 (E.D.Pa.1972); *Siegel v. Realty Equities Corp. of New York,* 54 F.R.D. 420 (S.D.N.Y.1972); *Cannon v. Texas Gulf Sulphur Co.,* 53 F.R.D. 216 (S.D.N.Y.1971); Fed.R.Civ.P. 23(a)(2). This factor has been satisifed. The instant action describes USF as a corporation that engaged in an alleged fraudulent course of real estate manipulations from 1966 until 1972, which artificially inflated its assets and income and concealed its liabilities. In this respect, Touche allegedly aided, abetted and actively participated in concert with USF (1) by defrauding the investing public about USF's financial condition through the use of material misrepresentations and omissions of fact, and (2) by being negligent in the conduct of its audits of USF and in its preparation and certification of USF's financial statements.

■ Hence, typical of the questions of law and fact common to all debenture holders if joined in a class are:

(1) Whether Touche is liable for negligence or fraud in its preparation of the annual and semi-annual financial statements of USF and all other financial material supplied to purchasers of the debentures;

(2) Whether Touche is liable for negligence or fraud in its certification of the annual and semi-annual financial statements of USF and in its certification of the three-year statement of earnings of USF contained in the offering circular for the debentures;

(3) Whether Touche engaged in acts, practices and a course of business that operated as a fraud upon the debenture holders;

(4) Whether Touche made untrue statements of material fact in preparing and certifying the annual and semi-annual financial statements of USF, in preparing and certifying the three-year statement of earnings of USF contained in the offering circular for the debentures, and in preparing all other financial information supplied to the debenture purchasers; and

(5) Whether Touche omitted to state material facts necessary to make the statements it made not misleading.

### 3. "Typicality"

■■ This action meets the third aspect of Rule 23(a) because the claims and defenses, if any, of the representative plaintiffs are typical of the claims and defenses of the purported class. *Lewis v. Bogin,* 337 F.Supp. 331 (S.D. N.Y.1972); *Guarantee Insurance Agency Co. v. Mid-Continental Realty Corp.,* 57 F.R.D. 555 (N.D.Ill.1972); *Wolfson v. Solomon,* 54 F.R.D. 584 (S.D.N.Y. 1972); Fed.R.Civ.P. 23(a)(3). On behalf of themselves and all others similarly situated, the representative plaintiffs seek damages as their relief for defendant's alleged fraud and negligence, and they point to the same broad course of alleged fraudulent conduct to support those contentions. Also similar to the other potential members of the class, they are holders of a particular type of debenture purchased pursuant to their reliance [12] upon various documents touting the growth and stability of USF. For these reasons, the named plaintiffs

12. Touche maintains that the named plaintiffs have claims atypical to those of other possible class members because individual proof of reliance is required by the United States Court of Appeals for the Ninth Circuit. *White v. Abrams,* 495 F.2d 724 (9th Cir. 1974). For reasons to be stated and discussed *infra,* no individual proof of reliance need be established because of an alleged "common course of fraudulent conduct" by defendant. Even if some particular showing of reliance was required of certain potential class members, the "typicality" of claims among the named and unnamed plaintiffs is not destroyed because a representative's claims or defenses need only be typical of, not identical to, every possible member of a class. *Cottrell v. Virginia Electric & Power Co.,* 62 F.R.D. 516 (E.D.Va.1974); *In re Four Seasons Securities Laws Litigation,* 59 F.R.D. 667 (W.D.Okl.1973).

have claims against Touche, that are typical of other possible class members.

### 4. "Representativeness"

Finally, this Court finds that the four plaintiffs in this action are representative parties who will fairly and adequately protect the interests of other unnamed plaintiff debenture holders. *Herbst v. Able*, 278 F.Supp. 664 (S.D.N.Y.1967); *Rosenblatt v. Omega Equities Corp.*, 50 F.R.D. 61 (S.D.N.Y.1970); Fed.R.Civ.P. 23(a)(4).

The requirement of "adequate representation" is composed of two elements: (1) the interest of the representative party or parties must coincide with that of the potential class; and (2) the representative party or parties must vigorously prosecute the action. *Dolgow v. Anderson*, 43 F.R.D. 472 (E.D.N.Y. 1968). Defendant challenges both elements, stating that each of the four plaintiffs in this lawsuit have conflicting interests with any possible class member and that these antagonistic interests will prevent plaintiffs from exerting their best efforts on behalf of other similarly situated debenture holders. Since the "representativeness" requirement is one of the most critical factors that must be satisfied before any class action certification can occur, defendant's objections must be examined in depth for substantiality.

Touche contests plaintiffs' assertion that they are proper representatives of other debenture holders for several reasons. First, defendant contends that Societe is an improper representative because of the latter's relationship with USF and USFO. It appears that Societe was a member of the underwriting syndicate offering the 9% debentures to the public in 1970. Before that initial offering, Societe committed itself to purchase $125,000 in debentures, but at the time of the offering, it purchased an additional $125,000. Thereafter, it sold the $250,000 in debentures and received its fees. In 1971, Societe again acted as an underwriter for USF in an offering of 5½% subordinated debentures issued in the United States, subscribing to $100,000 of the debentures, but only selling $70,000 and receiving its fees. As a result of its participation in this latter offering, Societe has been named as a defendant in one of the actions now pending before this Court in the above-captioned litigation. Thus, defendant maintains, the foregoing activities require Societe to consider its position both as a defendant and as a representative of a possible class of plaintiffs in the event a settlement accrues to the various plaintiffs in all actions in this litigation. Moreover, since underwriters are potential defendants in any purported Rule 10b–5 action based upon the sale of securities, Societe would refrain from instituting an action against its colleague underwriters because it would destroy Societe's ongoing business relationships with them and they might, in turn, sue Societe.

This Court remains unconvinced by defendant's first argument. Societe's participation in the underwriting of the 9% debentures was only $250,000, or 2% of the total face amount sold. By contrast, Societe purchased $796,000 of those debentures. The economic realities of the situation indicate that Societe, as a subunderwriter and not as a lead underwriter, also could have been deceived by USF, USFO, Touche and possibly others into making substantial purchases of those debentures. Furthermore, as a subunderwriter, it may not have participated intentionally or discovered the participation of others in the perpetration of USF's alleged fraud upon the investing public. Simply because underwriters are one type of defendant perennially sued in such circumstances, this should not, without more, compel one to reach the conclusion that Societe was an actor in the alleged fraud and, therefore, that its interests are in conflict with other debenture holders. In fact, no 9% debenture holder has

sued or threatened to sue Societe or any other underwriter on this particular offering in over two years, and more than 50% of the debenture holders have expressed their faith in Societe as a class representative by agreeing to support this action. On balance, the relevant facts in Societe's action as a defrauded purchaser of debentures against Touche demonstrates that Societe's actual economic interest of approximately $800,000 far outweighs any theoretical liability it may have as a potential defendant.

■ Likewise, Societe's commitment in the 5½% debenture underwriting was for only $100,000 or .29%, of which Societe purchased and sold $70,000. From the record before this Court, it seems that Societe is but a nominal defendant in one action involving this offering. Whether Societe was engaged in a fraud upon the investing public in this matter is irrelevant because the speculative nature of its liability in the 5½% debenture offering should not, without additional facts, similarly taint its activities in the 9% securities transactions. Also, no conflict of interest is apparent at this time concerning the attorneys representing Societe in the 9% debenture action because Societe has retained separate counsel to defend them, if necessary, in the 5½% debenture action. Therefore, the dreadful consequences that are envisioned by Touche should this Court permit Societe to proceed as a class representative are illusory at this juncture. Indeed, it might happen that Societe may lose or settle as a defendant in another action concerning the USF debacle, but each action involved in this litigation is to be adjudicated upon the facts peculiar to it. As for the argument that other underwriters might be legitimate defendants in the 9% debenture action, Societe testified at the evidentiary hearing conducted by this Court on the propriety of a class action that it is willing to sue any and all defendants provided two factors are present—valid causes of action exist against possible defendants, and potential defendants possess sufficient assets to make an action or actions against them worthwhile. Currently, no reason exists to doubt that testimony.

Touche's second opposition to the adequacy of plaintiffs' representation focuses upon the roles of plaintiffs Rentinvest and NAFA. Defendant argues that these plaintiffs are mutual funds created and controlled by Societe and, therefore, if Societe is an improper representative, so are these two plaintiffs. For the aforementioned reasons stated by this Court validating Societe's status as an adequate representative of other unnamed debenture holders, Rentinvest and NAFA are likewise designated class representatives. In addition, it should be noted that these two plaintiffs, while affiliated with Societe, are distinct entities that have never engaged in any securities underwritings.

■ Defendant's third objection states that plaintiff ITF is an improper representative because (1) one of its affiliates acted as an underwriter for debentures in Europe, (2) ITF has a business relationship with Goldman, Sachs & Co., one of the lead underwriters for the debentures, and (3) ITF is managed and controlled by Securities Management Co., Ltd., which is 25% owned by FNCB, who is the indenture trustee for the very debentures involved in this lawsuit. Without more than bald assertions on Touche's part about conjectural conflicts of interests between the named and unnamed plaintiff debenture holders, these objections are tenuous at best. It is not uncommon for a subunderwriter not to be aware of fraud perpetrated by the corporation making the securities offering, and besides, this affiliate may not have even participated in the 9% debenture underwriting; a business relationship with a company who, although a lead underwriter for the 9% debentures, is not a defendant in this action, does not create necessarily a conflict of

**38**

interest because various forms of corporate business do proceed despite the institution of lawsuits; and FNCB is not a defendant in any of the actions in this massive litigation.

 Touche's final argument is that all plaintiffs are improper class representatives because they did not purchase the debentures on every business day between April 8, 1970, and July 23, 1973, and, accordingly, persons or institutions who did not purchase debentures on days that plaintiffs did will not be protected adequately by plaintiffs. This Court disagrees. An examination of plaintiffs' purchase dates indicates that they continuously bought debentures from April 8, 1970, until March 1, 1973. In this Court's view, a lack of purchases for approximately four months, between March and July of 1973, will not destroy plaintiffs' status as appropriate protectors of other debenture holders' interests, especially when a continuous course of fraudulent conduct is alleged as in the present litigation. A survey of decisional law indicates that a claimant can be an adequate class representative even if he purchased securities either at the commencement or at the termination of the relevant class period.[13] Hence, if it is possible for a representative to purchase securities at either pole of the fraudulent interval, plaintiffs' position here is even stronger because they continuously bought their debentures throughout this time, although not on every day between April 8, 1970, and July 23, 1973. Furthermore, as a practical matter, counsel for plaintiffs has a substantial interest in demonstrating that Touche's alleged fraud and negligence extended over the entire class period because the success of the class as a whole will largely determine counsel's remuneration.

In summary, it appears at this time that (1) no real conflict of interest exists between any of the plaintiffs and the putative class members, and that (2) plaintiffs are committed to a vigorous prosecution of this matter. To whatever extent some of the plaintiffs are theoretical defendants in this action or have contact with actual or potential defendants in other lawsuits involving USF's alleged machinations, their alleged economic injuries far outweigh their alleged liabilities. Testimony by representatives of each plaintiff shows that the officers of every plaintiff seek to fulfill the fiduciary duties owing to their shareholders by employing competent counsel to recoup their substantial losses via vigorous prosecution of this action, whether it be as a class or as an individual action. Assuming *arguendo* that any of the named plaintiffs fail to protect the unnamed class members' interests at any time in the course of these proceedings, they can and will be removed as representatives and, if necessary and possible, be replaced by others.

### B. *Rule 23(b)(3) Requirements*

In addition to the mandate of Rule 23 that all of the prerequisites of subdivision (a) be satisfied before an action may be maintained as a class action, this Court must determine whether plaintiffs have met their burden of establishing that (1) "questions of law or fact common to all members of the class predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S. Ct. 2131, 23 L.Ed.2d 766 (1969); *Brennan v. Midwestern United Life Insur-*

13. In *Fischer v. Kletz*, 41 F.R.D. 377 (S.D. N.Y.1966), the representative purchased in the beginning of the class period, whereas in *Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), the representative purchased in the latter portion of the relevant time frame.

*ance Co.,* 286 F.Supp. 702 (N.D.Ind. 1968), *aff'd,* 417 F.2d 147 (7th Cir. 1969), *cert. denied,* 397 U.S. 989, 90 S. Ct. 1122, 25 L.Ed.2d 397 (1970); *Fischer v. Kletz,* 41 F.R.D. 377 (S.D.N.Y. 1966); Fed.R.Civ.P. 23(b)(3). Since this is an area of great dispute amongst the parties to this action, a detailed analysis of their respective positions about each of the two Rule 23(b)(3) requirements is warranted.

Naturally, plaintiffs assert that common issues of law and fact exist and predominate over individual questions because of an alleged broad course of fraudulent and negligent conduct by Touche arising from its audits of USF and its preparation and certification of USF's financial statements. Touche counters this contention by arguing that it did not participate in a consistent course of conduct throughout the relevant period because the various alleged misrepresentations and omissions that occurred over several years about different transactions were disseminated through dissimilar media to varying parties at disparate times. Consequently, defendant maintains, no common factual or legal questions can predominate over individual issues. In support of its position, defendant emphasizes three matters that require under *White v. Abrams* [14] a finding that individual rather than common questions predominate—"duty," "reliance," and "materiality."

Initially, Touche argues that the question of the "duty" it owes each claimant is individual in nature and, therefore, the predominance of common issues does not exist. It refers to *White v. Abrams, supra,* wherein the appellate court examined the "scienter" requirement of Rule 10b–5 and enunciated a "flexible duty standard," which is to be employed by the trier of fact to define the duty owed by a defendant to each plaintiff. The United States Court of Appeals for the Ninth Circuit described certain factors that must be considered to define the precise duty owed:

> *Without limiting the trial court from making additions or adaptations in a particular case,* we feel the court should, in instructing on a defendant's duty under rule 10b–5, require the jury to consider the relationship of the defendant to the plaintiff, the defendant's access to the information as compared to the plaintiff's access, the benefit that the defendant derives from the relationship, the defendant's awareness of whether the plaintiff was relying upon their relationship in making his investment decisions and the defendant's activity in initiating the securities transaction in question. [Footnotes omitted throughout quote.] (Emphasis added.) *Id.* at 735–36.

Armed with this decision, Touche contends that this Court must consider certain variables to ascertain the "duty" Touche might owe each member of the putative class: (1) the degree of investment sophistication of a debenture holder; (2) the ease of access to information of a debenture holder; (3) the relationships, if any, of a debenture holder with defendant or potential defendants; (4) whether the holder purchased his debentures through negotiated transactions or on the open securities market; (5) the timing of the debenture purchases; and (6) the misrepresentations received or omissions made, if any, and the effect of both upon a debenture holder in terms of reliance. Consequently, defendant asserts, each of these factors must be explored so that Touche may have the opportunity to assert any defense it might have against each particular claimant.

Secondly, Touche asserts that since a Rule 10b–5 action requires each potential class member to establish that he "relied" on a misrepresentation allegedly

14. 495 F.2d 724 (9th Cir. 1974).

made by defendant, individual questions predominate over common issues. Defendant maintains that the previously mentioned factors about Touche's "duty" toward potential plaintiffs, wherein an individualistic approach is demanded, must also be applied in the area of "reliance."

Finally, defendant contends that individual and not common factual and legal questions predominate because an action under Rule 10b–5 requires a demonstration by each claimant of the "materiality" of the alleged misrepresentations or omissions made by Touche. Once again, defendant argues that the variables previously stated that endow Touche with an individual "duty" toward each possible class member are applicable to the question whether certain alleged misrepresentations or omissions were "material" to a debenture holder.

 While Touche presents credible arguments in these areas of "duty," "reliance" and "materiality," this Court is not persuaded by them. First, the language of Rule 10b–5(a) and (b) makes it unlawful "to employ any device, *scheme* or artifice to defraud" or "to engage in any act, practice, or *course of business* which operates or would operate as a fraud or deceit upon any person." (Emphasis added.) Pursuant to this Rule, the relevant inquiry could focus upon the existence of a broad course of fraudulent conduct, which, in the instant action, has been alleged. Although Touche is charged with having been negligent and fraudulent in auditing USF's financial condition, and in preparing and certifying as true various USF financial statements, all of these separate acts, taken together, form a "course of business" or "scheme" to defraud investors. Therefore, proof of this element is both relevant and common to the claims of each potential class member.

 In addition, if this Court were to accept defendant's argument that the "flexible duty standard" renders this class action impracticable because it is necessary to evaluate the "duty" owed by Touche to each of the named and unnamed plaintiffs, literally thousands of determinations of "duty" would be required. As this Court previously stated, to read the Ninth Circuit's decision in *White v. Abrams,* 495 F.2d 724 (9th Cir. 1974), relied upon by Touche, as requiring each member of a class of purchasers of securities to prove the individual, subjective "duty" owed to him by Touche, especially in an action against certified public accountants, would be "incongruous" for two reasons.[15] *In re U. S. Financial Securities Litigation,* 64 F.R.D. 443 (S.D.Cal. 1974), *appeal dismissed* (9th Cir. 1975). Initially, the overall impact of *Abrams* is to extend the range of liability in individual Section 10(b) actions. Negligent conduct, which has been rejected by some courts as the basis for a Rule 10b–5 claim, is adequate now in the Ninth Circuit to establish liability under certain circumstances. It would, therefore, be incongruous for *Abrams* to restrict the use of class actions, which is the primary vehicle by which the investing public may obtain a

---

15. In *Abrams,* the defendant was an individual who, using his close personal relationship with the plaintiffs that the, Court described as "a long relationship as a trusted friend and advisor," urged plaintiffs to invest in corporations controlled by an individual who paid defendant commissions for finding private lenders. Plaintiffs essentially alleged that defendant had lured them into investing by making material misrepresentations, by omitting to state material facts and, generally, by exploiting his relationship with them.

The trial court had charged the jury that defendant's representations, if material, "violated the Federal securities laws *even if you find that defendant did not know* the falsity of the misrepresentation he made to plaintiffs." (Emphasis supplied.) *Id.* at 728. The appellate court held that this jury charge was improper because it would make the defendant an insurer of his representations, but the court did adopt the so-called "flexible duty standard."

recovery for Section 10(b) violations. Secondly, it will be unnecessary for the trier of fact in this action to determine the duty of Touche to each plaintiff. The great majority of plaintiffs are open market purchasers and, hence, their relationships to defendant are identical. The determination of Touche's "duty" to the class as a whole will be no more difficult than establishing the "duty" of defendant to an individual plaintiff.

The question of the appropriate standard of care to be applied to accountants under Rule 10b–5 is important particularly in determining what type of "duty," if any, must be demonstrated by the members of the class. This is not a situation, as was *White v. Abrams,* of one person making specific representations to a small group of investors to induce them to invest. Rather, this is a case of a firm of certified public accountants who held themselves out to the investing public as (1) competent CPA's who (2) conducted thorough and complete audits of USF in accordance with generally accepted auditing standards, (3) prepared and examined the financial statements of USF in accordance with generally accepted accounting standards, and (4) certified those financial statements as completely representing the financial condition of USF. To misread the language of the court's opinion in *Abrams,* as Touche would, to require the individual establishment in this case of "duty" and "reliance" by each debenture holder, would create just the incongruous result that this Court perceived and rejected in its decision in *In re U. S. Financial Securities Litigation, supra.*

■ Defendant argues that common questions do not predominate over individual ones because great variation exists in the alleged information either withheld or misrepresented and in the degree of "reliance" by investors. While "reliance" was long an especially troublesome problem in securities class actions, this burdensome matter is well on its way toward extinction.

The immediate solution to Touche's contention is to bifurcate the action and proceed to trial on all the common elements and then, if necessary, have individual trials on the "reliance" issue. This approach has been the accepted view in this Circuit. If it were not followed on occasion, it could negate any attempted class action under Rule 10b–5 since, as the district courts have recognized, "reliance" is an issue lurking in every 10b–5 action. *Green v. Wolf Corp.,* 406 F.2d 291 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). While bifurcation continues to be an accepted solution to the "reliance" issue, it has not been without criticism. *See* American College of Trial Lawyers, *Report and Recommendations of the Special Committee on Rule 23 of the Federal Rules of Civil Procedure,* 8–10 (1972); Simon, *Class Actions—Useful Tool or Engine of Destruction,* 55 F.R.D. 375, 382–83 (1972). Perhaps the most succinct statement of the issue was made by Judge Spencer Williams in *Grad v. Memorex Corp.,* 61 F.R.D. 88, 98 (N.D.Cal.1973):

> Use of the bifurcation method, however, does not resolve what appears to be an inherent conflict between proof of the reliance element of a 10b–5 action and the "predominance of common issues" requirement of Rule 23(b)(3); it merely *delays* resolution of the problem until a later date. But this delay in effect prohibits the court from affirmatively finding that the cause is *manageable* as a class action as required by Rule 23(b)(3)(D). That is, if actual individual reliance in its common law sense need be proved by each class member, the trial of that issue, even at a later stage in the proceedings, would tax the court's (and counsels') resources to an intolerable extent. Accordingly, the court is constrained to deal with the reli-

ance enigma at the outset in making its determination of whether a class should be certified. (Emphasis supplied.)

There are potentially several hundred members of the proposed class involved in this action. Before this Court makes any decision to bifurcate the issues and face the harrowing experience of administering a multitude of individual trials on separate "reliance" questions, the developing decisional law in this area should be examined to determine if other solutions are available.

Even prior to the adoption of the 1966 revision of Rule 23, it was unnecessary to show that all investors relied on the same document. In *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909 (9th Cir. 1964), the Ninth Circuit rejected an argument that various investors stood in different positions concerning representations made to them, and held that it was sufficient to maintain a class action if the complaint alleged "a common course of conduct over the entire period, directed against all investors, generally relied upon, and violating common statutory provisions." [16] Years later, *Fischer v. Kletz,* 41 F.R.D. 377 (S.D.N.Y.1966), adopted the *Harris* "common course of conduct" theory and stated that there is no material variation among misrepresentations if the financial statements are "interrelated, interdependent, and cumulative." The court illustrated this point with an often quoted simile:

> To be sure, we are not dealing here with a single alleged fraudulent misrepresentation or the issuance of a single document containing several alleged misrepresentations. Like standing dominoes, however, one misrepresentation in a financial statement can cause subsequent statements to fall into inaccuracy and distortion when considered by themselves or compared with previous misstatements.[17] *Id.* at 381.

■ This Court perceives that the *Harris* and *Fischer* decisions pertain to a situation in which the same misrepresentations are reiterated throughout a series of documents. Under such circumstances, there is a commonality of "reliance" among all investors because each is relying, in essence, on the same misrepresentation regardless of which document he consults. While such a theory is reasonable for the present factual situation, it is not entirely applicable because this action contains certain divergent misrepresentations reported in different statements by Touche. Nonetheless, it is unnecessary to reject a class designation at this time because of the possible inadequacy of this theory to this case since three other "reliance" concepts have emerged that make a class action feasible.

The first concept is found among some Rule 10b–5 decisions, wherein the investor's "reliance" is based not so much on particular misrepresentations as on the "artificially inflated price" of securities that may have been the result of a series of misrepresentations. This theory has found its most explicit exposition in *Grad v. Memorex Corp.,* 61 F. R.D. 88 (N.D.Cal.1973), in which the fraudulent period from August 1970 to April 1971 was punctuated with differing misrepresentation in Securities and Exchange Commission filings and news releases. The court made these observa-

---

16. *Harris* is a somewhat unsatisfactory signpost for the instant action because, although it clarified that all investors need not rely on one document, it does not indicate how much variation in misrepresentations and reliance thereon is possible before commonality of fact is destroyed.

17. As in *Harris,* the facts given in *Fischer* do not indicate the amount of variation in misrepresentation and reliance that will be tolerated.

tions, which are appropriate for this action:

> [W]hile some sort of reliance on the part of the plaintiff still must be proved, it appears that reliance of the actual, subjective, individual nature necessary in the classical fraud case would unnecessarily encumber large 10b–5 actions and thereby thwart the Congressional interest in providing a means by which investors may recover against market manipulators in federal court. In the stock exchange context (as opposed to closely held stock sold and purchased in a face-to-face transaction) the interest of Congress in seeing that the integrity of the market is preserved is even greater. *Id.* at 99.

\* \* \* \* \* \*

In recent years a more realistic definition of the reliance requirement has evolved, the use of which permits huge securities cases to proceed under Rule 23(b)(3), yet assures fairness to the defendant. By use of an objective standard of reliance, focusing on a "causal nexus" between the alleged misstatements and an inflated price upon which plaintiffs relied, the court (and jury) is freed from the overwhelming task of examining the subjective intent of each class member in his decision with respect to his stock.

This approach to the reliance element is not as revolutionary as defendants warn, nor does it destroy substantive rights as they have been defined in past decisions. As noted above, even in common law fraud actions, it is *causation* that is the basis of what we refer to as reliance. (Emphasis supplied.) *Id.* at 100.

\* \* \* \* \* \*

If it is demonstrated that the Memorex documents materially misrepresented the financial status of the corporation and that the market responded thereto in a manner that the stock can be said to have been "inflated," and that it was reasonable for an investor to rely thereon, then a sufficient showing of a causal connection between the misrepresentations and the purchases by class members will have been made. *Id.* at 101.

*See also Siegel v. Realty Equities Corp. of New York,* 54 F.R.D. 420 (S.D.N.Y. 1972).

 As is readily apparent, the "artificially-inflated" market price theory renders it unnecessary for each investor to prove that he relied upon the same misrepresentation or omission. It is sufficient to show that there were different misrepresentations or omissions, which were a part of a common scheme to manipulate the price of the stock. Although some variance may exist among Touche's alleged misrepresentations and omissions, those misleading financial statements and omissions *in toto* are responsible for an allegedly uninterrupted manipulation of the value of USF securities over the relevant period, which gave USF the appearance of financial solidarity to the investing public.

The second theory that can be utilized in this action to avoid the actual, individual demonstration of reliance by each claimant is found in the United States Supreme Court's ruling in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), *rehearing denied,* 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692 (1972). In that case, the Court held that when an action proceeds, in whole or in part, on the nondisclosure of material facts, all that is required is that a reasonable investor might have considered the facts withheld as "material" to his investing decision.[18] This reasoning

18. *See generally In re Caesars Palace Securities Litigation,* 360 F.Supp. 366 (S.D.N.Y. 1973); *In re Penn Central Securities Litigation,* 347 F.Supp. 1327 (E.D.Pa.1972); and

has been extended to apply to firms of certified public accountants. *See, e. g., Hochfelder v. Ernst & Ernst,* 503 F.2d 1100 (7th Cir. 1974), *cert. granted,* 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 773 (1975).

The final concept is the "constructive reliance principle" announced in *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341 (2d Cir. 1973), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973), wherein the United States Court of Appeals for the Second Circuit stated that "[t]he reliance standard also has been relaxed under certain circumstances; for example, if a material omission or misstatement is proven, a presumption may be raised that the plaintiff relied on the deception to his detriment." *Id.* at 357. This rule is particularly applicable to impersonal, open market transactions such as are involved in the instant case:

> Where the transaction is accomplished through impersonal dealings, such as on a stock exchange, or for some other reasons the factors that influenced the parties are not readily apparent, the decisions have discussed liability in terms of the "materiality" of the misrepresentation. [Citations omitted.] . . . This constructive reliance principle is particularly appropriate in class actions where proof of actual reliance by numerous class members would be impracticable. [Citation omitted.] *Id.* at 374.

More recently, in *Tucker v. Arthur Anderson & Co.,* 67 F.R.D. 468 (S.D.N.Y., 1975), the court, after quoting the above language from the *Chris-Craft* case, said:

> Allowing a presumption of reliance by a showing of materiality—*i. e.,* constructive reliance—in cases involving open market transactions follows the same reasoning as allowing such a presumption in cases of nondisclosure.

*Entin v. Barg,* 60 F.R.D. 108 (E.D.Pa.1973), wherein the courts have refused to deny a class action designation in "nondisclosure"

In both instances there are practical difficulties in proving reliance. In "fraud on the market" cases—as opposed to face-to-face dealings—the causation requirement can be satisfied if plaintiffs can show that the misrepresentations affected the market (artificial price inflation) and damaged the plaintiffs. As in cases of nondisclosure, proof of materiality leads to a logical inference of reliance. If the reasonable investor would have been influenced to purchase by the alleged material misrepresentation and omissions then many traders in the market may have been similarly influenced. ['Citation omitted.] *Id.* at 480.

Once again, Touche's wielding of the *Abrams* decision to show that "reliance" issues are necessarily individual is misplaced. Nothing in *Abrams* detracts from the various aforementioned rulings and dicta in other actions. The statements from *Abrams* cited to this Court by defendant must be read in light of the facts before the *Abrams* court and with due regard for that tribunal's admonition—"while giving examples in the nature of generalization is fraught with dangers, we do so by way of guidance." *White v. Abrams,* 495 F.2d 724, 736 (9th Cir. 1974).

■■ Touche lastly contends that each class member will have to prove separately how any alleged misrepresentations and omissions were "material" to him, that is, the circumstances surrounding each purchase by each member of the class must be examined to determine "materiality." This court does not agree. In *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341 (2d Cir. 1973), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973), the court discussed "materiality" as follows:

> The concept of materiality focuses on the weightiness of the misstated or omitted fact in a reasonable investor's

actions when faced with the question whether individual reliance must be proved.

decision to buy or sell. We articulated the materiality standard in *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 [2d Cir. 1965], *cert. denied*, 382 U.S. 811 [86 S.Ct. 23, 15 L.Ed.2d 60] (1965), to be "whether 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.'" [Footnote omitted.] The materiality test is concerned only with whether a prototype reasonable investor would have relied. *See Heit v. Weitzen*, 402 F.2d 909, 912–14 [2d Cir. 1968], *cert. denied*, 395 U.S. 903 [89 S.Ct. 1740, 23 L.Ed.2d 217] (1969). Account must be taken of all the surrounding circumstances to determine whether the fact under consideration is of such significance that a reasonable investor would weigh it in his decision whether or not to invest. [Citation omitted.] *Id.* at 362–63.

"Materiality" is viewed by an objective rather than a subjective standard. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), *rehearing denied*, 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692 (1972); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). The "surrounding circumstances" must be examined to determine whether a reasonable investor, not the individual investor, would attach importance to the alleged misrepresentation or omission.

██ ██ Anticipating that this Court might find "materiality" to be a common issue to be analyzed on an objective basis, Touche proffers the alternative argument that plaintiffs cannot present a homogeneous class because "materiality" in this action varied over time. This argument flows from defendant's assertion that a number of events transpired and statements issued during the relevant period, which made certain matters immaterial to the reasonable investor. On this motion for class certifica-

tion, this Court cannot delve into the merits of the complaint and decide whether the alleged misrepresentations and omissions were "material." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Therefore, for all of the reasons previously discussed by this Court rejecting an individualistic approach to proof of "duty" and "reliance" issues because of an alleged "common course of fraudulent conduct," "materiality" is found also to be a common factual question. If, at a subsequent point in this action, Touche is able to demonstrate that the alleged misrepresentations and omissions were not "material," or that justice requires that each class member individually prove "materiality" as to him, then this Court, under the flexibility provided in Rule 23(c)(1), will alter or amend the class certification order either to narrow the class to those who purchased during the period when there was "materiality," or to compel any or all claimants to demonstrate the materialness of the alleged misrepresentations or omissions on an individual basis. *See Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). The same approach can and will be utilized in the areas of "duty" and "reliance" should subsequent developments so necessitate.

██ The other requirement of Rule 23(b)(3)—that the class action device be superior to other available methods for the fair and efficient adjudication of the controversy—includes the problem of "manageability," which encompasses the entire range of practical problems that may render a class action inappropriate. To avoid the danger of prolixity, permit it to be succinctly stated that an abundance of authorities sustain the superiority of a class action in situations such as this (*Wolfson v. Solomon*, 54 F.R.D. 584 (S.D.N.Y.1972)), especially when investors may not otherwise seek recovery (*Korn v. Franchard Corp.*, 50 F.R.D. 57 (S.D.N.Y.1970),

*rev'd and remanded,* 456 F.2d 1206 (2d Cir. 1972)). Moreover, this lawsuit requires a class action designation because of the unfeasibility of joinder of all debenture holders pursuant to Rules 19 and 20 of the *Federal Rules of Civil Procedure.* As previously stated in the section of this opinion denominated "numerosity," joinder of all potential plaintiffs cannot be effectuated because the bearer nature of the debentures conceals their identities at this time. In addition, it is conceivable that several hundred debenture holders exist abroad, many with relatively small purchases. Requiring them to join together into one action will increase the expense of this lawsuit because, if nothing else, they individually and in small groups will employ several counsel to represent their interests. By contrast, one law firm represents the named plaintiffs, and will protect the interests of the unnamed plaintiffs now that this lawsuit is being certified as a class action. It must be remembered that one of the rationales for Rule 23 is to prevent the "death knell" of a nonfrivolous action simply because it is too expensive for small investors to prosecute individually.

▆ Nevertheless, certification of this dispute as a class action is foreclosed, Touche argues, because certain "manageability" problems still exist; specifically, (1) certain members of the purported class cannot be identified, and consequently, (2) these debenture holders cannot be notified in a proper fashion of the pending class action. This Court once again disagrees because, while it is true that the "bearer" nature of the debentures precludes the identification of certain holders, this alone should not frustrate an otherwise feasible class action.

It would be incongruous under the "numerosity" requirement of Rule 23(a)(1) to allow a purported class representative to satisfy Rule 23(a)(1) without an ascertainment of the precise number and identities of all potential class members for class definition purposes (*Herbst v. Able,* 278 F.Supp. 664 (S.D.N.Y.1967)), and at the same time, require the identities of all possible class members for "notice" purposes. Moreover, Touche itself maintains at two different points in its argument opposing class action certification that joinder of all debenture holders is practicable since the identity of each can be ascertained, although this class action is unmanageable because these bearer instruments preclude both specific identification of holders and actual, individual notice to them. Touche confuses specifically identifying class members with defining the class. Commonly, a class will contain members not individually identified but adequately defined as holders of certain securities. In *Fischer v. Kletz,* 41 F.R.D. 337 (S.D.N.Y.1966), the court held that failure to specify the exact number of class members did not preclude maintenance of a class action, and that in a securities fraud action any other ruling would frustrate the purpose for which the class action procedure was designed. Furthermore, many cases have held that the inability to identify all class members is not a ground for denying class certification. *See, e. g., Davy v. Sullivan,* 354 F.Supp. 1320 (M.D.Ala.1973); *B & B Investment Club v. Kleinert's Inc.,* 62 F.R.D. 140 (E.D.Pa. 1974); *Albertson's Inc. v. Amalgamated Sugar Co.,* 62 F.R.D. 43 (D.Utah 1973); *Entin v. Barg,* 60 F.R.D. 108 (E.D.Pa. 1973). *Werfel v. Kramarsky,* 61 F.R.D. 674 (S.D.N.Y.1974), was, in fact, a situation in which the court permitted a class action on behalf of a class of holders of bearer securities when the number of members of the class was unknown.

▆▆ Equally without merit is defendant's related contention—the inability to identify every debenture holder prevents effective notice to the potential class members. Again, Touche misconstrues the requirement of Rule 23, which requires "individual notice" to all mem-

bers who can be identified through reasonable effort. Individual notice has never been required to be given every member of every class. Rather, in construing the clear provisions of Rule 23(c)(2), courts have required individual notice to be given to every "identifiable" class member along with some other form of notice to the unidentified members. Indeed, in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732 (1974), the United States Supreme Court stated:

> We think the import of this language [of Rule 23(c)(2)] is unmistakable. Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort.

■ In the case at bar, holders of 58% of the debentures are known to plaintiffs and FNCB knows the names of other, and perhaps most, debenture holders. Plaintiffs are willing to give individual notice to each class member known to them and to each class member who can be identified through reasonable effort from FNCB or otherwise. The remainder of the class will be given whatever notice this Court deems sufficient, so long as that notice is the best practicable under the circumstances.

Therefore, this Court will require the class representatives, on behalf of the class of debenture holders they represent, to exert reasonable effort to identify every debenture holder possible and, thereafter, to provide those class members with actual and individual notice of the pendency of this class action. Since the type of notice to be given unascertainable debenture holders is within the sound discretion of this Court, plaintiffs are compelled further to publish the aforementioned notice to any unknown and not easily ascertainable class members. In this Court's view, notice by publication is the best practicable method of informing unknown debenture holders of this matter. At the very most, 42% of the purchasers of debentures will not be identifiable. If notice is published (1) in various foreign countries, principally in Europe and Latin America, where most of the remaining unknown holders appear most likely to be, (2) in secular and financial newspapers and magazines of wide circulation, and (3) in appropriate foreign languages, adequate notification should be assured.

## IV. PROOF OF DAMAGES

■ To recover damages, members of the class now being certified must prove, in addition to the elements comprising their claims, (1) that they purchased their debentures within the relevant period from April 8, 1970, through and including July 23, 1973, the date of USF's default, and (2) that they are the present holders of these debentures. While plaintiffs seek a class of all holders of 9% Bearer Debentures due April 1, 1982, of USFO, this Court must necessarily limit the class to the above-noted period. To allow a speculator to purchase some of these debentures at a low, premium price after USF and USFO defaulted on them and, thereafter, to permit that person or entity to recover the full value of those debentures, if possible, when no economic injury was sustained by him because of Touche's alleged fraud or negligence, would be tantamount to this Court giving that speculator an unjustifiable monetary windfall.

■ Moreover, it would seem highly imprudent at this point to deny class certification because it may be difricult to prove damages on an individual basis. Since damages in this case do not appear to pose the same problem that is presented by the issues of "duty," "reliance" and "materiality," but rather, are a matter of administering a formula derived from the resolution of defendant's liability, if any is found, a bifurcated trial is planned, whereby the question of liability will be adjudicated preliminarily. If liability is determined to exist, a

separate trial or hearing will be scheduled so that each claimant may have the opportunity to prove that he (1) puchased the debentures within the relevant period, (2) presently possesses those debentures, and (3) suffered a financial loss in a certain amount.

## V. FOREIGN RECOGNITION OF AN AMERICAN COURT JUDGMENT

A unique aspect of this action is the effect of an American court judgment concerning foreign investors in a foreign court of law. Touche strenuously argues that "due process" precludes a class action when the class members are not citizens or residents of the United States because any decision by an American court would not be binding on the foreign class members and, therefore, would not be recognized by the foreign courts. Consequently, Touche justifiably fears that any foreign class member dissatisfied with the results obtained for them by the class representatives might pursue defendant once again in a foreign court. Moreover, the problem is exacerbated, defendant contends, by plaintiffs' inability to actually notify each class member, which prevents both Touche and those unnotified class plaintiffs from adjudicating any claims they may have against defendant. In support of its position, Touche has filed with this Court numerous affidavits by foreign attorneys discussing their countries' potential recognition of any judgment rendered by an American court. Additionally, Touche relies heavily on the recent decision of the Second Circuit in *Bersch v. Drexel Firestone, Inc., et al.*, 519 F.2d 974 (2d Cir. 1975), which superficially appears to be identical to the instant situation.

■ Upon extensive consideration of this issue, this Court is of the opinion that a class action still remains feasible for numerous reasons. Initially, plaintiffs have submitted to this Court affidavits [19] from a multitude of attorneys practicing or otherwise knowledgeable about the law in foreign countries where the majority of debenture holders are likely to reside or be located. These affidavits note that a typical class action procedure, in which the class includes and binds all class members who fail to affirmatively "opt-out" pursuant to Rule 23(c)(2), is unknown in those countries and that, theoretically, a class member who had taken neither affirmative action, such as "opting-in," nor affirmative participation, such as joining with other plaintiffs in the prosecution of an action against a defendant, probably would not be bound in their countries by any adverse judgment in the United States. Nevertheless, these affidavits also point out that practical difficulties in each country make lawsuits by these debenture holders virtually impossible. For instance, the literally thousands of relevant documents of Touche, USF, USFO and others located almost exclusively in this country, would have to be obtained and, except in Great Britain, translated by an official translator into the national language. Since all such documents are under the control of this Court, the translations would have to be made in the United States or certified copies of the documents would have to be made and transported abroad. Of even more significance than the enormous cost of such translations is the fact that "discovery," as it exists in the United States, is unknown abroad. In most countries, there is no procedure for discovery, while in other countries the permissible discovery would have to occur in the United States because every significant document, every material witness and every aspect of the alleged fraud is located within the United States. Successful prosecution of this

19. Affidavits submitted to this Court by plaintiffs pertain to the laws of the following countries: France, West Germany, Luxembourg, Norway, Great Britain, Belgium, Switzerland and Italy.

complex action, without discovery, would be impossible.

Moreover, in the event later actions are instituted against Touche, the defenses of *res judicata* or collateral estoppel may be valid to the extent that the issues in the subsequent actions are common to those adjudicated in this action. In addition, assuming *arguendo* that a judgment of this or any other American court in defendant's favor technically might not be *res judicata* against a debenture holder who took *no* affirmative steps in this action, it would be evidence in every country and it could be utilized by Touche in defense of subsequent foreign lawsuits.

Thirdly, and of utmost significance, on the basis of plaintiffs' affidavits, interrogatories propounded to defendant by plaintiffs and defendant's responses thereto, Touche is not present in several of the countries relevant to this action and, therefore, it is not amenable to suit by certain debenture holders. In those countries where its presence is found, it is a corporation that would not be liable for any unlawful acts committed by the Touche partnership in the United States. Judgments rendered by foreign courts against Touche could not be executed against those companies, thereby requiring a debenture holder who secured a judgment against defendant in a foreign country to enforce it in the United States. Being confronted with inconsistent judgments by a domestic and a foreign court, this or any other American court would be compelled to recognize and to enforce the domestic judgment.

Fourthly, Touche's fear of future lawsuits supercedes the fact that in more than two years since the collapse of USF and the discovery of the alleged fraud, no actions arising therefrom have been commenced outside the United States against Touche or any other defendant presently involved in this massive litigation.

Lastly, Touche's potential liability will not extend indefinitely if a class action is allowed that includes foreign investors. Should defendant lose or settle this action, it would have to pay appropriate damages on a *pro rata* basis only to each class member who submit and proves his claim. In the unlikely event that Touche subsequently is sued by a debenture holder who had taken no affirmative action herein, who did not "opt-out" of the class, and who was so dissatisfied with the amount of the award that he was willing to bear the expense of a new action, Touche still would have available to it the amount that would have probably been originally awarded to such debenture holder in this action.

Touche's argument additionally depends upon its interpretation of *Bersch v. Drexel Firestone, Inc., et al.*, 519 F.2d 974 (2d Cir., 1975). Such reliance upon *Bersch* is misplaced because *Bersch* does not preclude foreign nationals from membership in any class alleging violations of the federal securities acts simply because of *res judicata* problems. Actually, the court in *Bersch* ruled that the issue of *res judicata* was *one* of several factors to be considered in determining whether it would be an abuse of discretion to allow the foreign members of the proposed class in that case to assert common law fraud claims in federal court.

*Bersch* was a matter that involved foreign securities sold by foreigners to foreigners in connection with a fraud committed outside the United States. The plaintiff commenced a class action on behalf of himself and all other purchasers of the foreign securities. The appellate court decided that the federal securities laws did not apply to sales of the foreign securities outside the United States by foreigners to foreigners because of the almost complete absence of acts within the United States that contributed to the claimants' losses. For

that reason, it reversed the district court's determination of subject matter jurisdiction. Thus, if the action had been solely based on the federal securities laws, the complaint would have been dismissed as to the foreign members of the class for lack of subject matter jurisdiction. Nevertheless, because of an additional common law fraud claim, the appellate court had to decide whether, under the principles of pendent jurisdiction, to allow the action to proceed as a class action on behalf of the foreign members of the class. (*Id.* at 993.)

The Second Circuit declared that it would not consider the "difficult issue" of whether the lack of complete diversity and the improbability that each purchaser had a claim exceeding $10,000 deprived the court of jurisdiction under *Zahn v. International Paper Co.,* 414 U. S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), because it ruled that, "even if . . . the district court [had the] power to . . . entertain the state law claims, it would be an abuse of discretion for it to do so" (519 F.2d at 996) for five reasons:

(1) the common law fraud claims of the foreign class members were so many times larger than the amounts claimed by American class members under the federal securities laws that it was "ludicrous" to characterize the foreign claims as "pendent" (*Id.* at 996);

(2) given the foreign character of the suit, the legal issues raised by the claims of the foreign class members would, under choice of law principles, require the application of the laws of up to fourteen different nations rather than the relatively strict standard available under federal securities laws that had been ruled inapplicable (*Id.* at 996);

(3) international economic and diplomatic policy compelled the withholding of jurisdiction because there was no domestic United States impact from the substantially foreign transactions (At 996);

(4) a tremendous burden would be imposed by the size of the class (11,000,000 shares were outstanding) and the entirely foreign character of the transactions (*Id.* at 996); and

(5) over 395 class members of 22 nationalities had *already* asserted claims against the defendants in Europe, 90 of which had already been settled, and unopposed affidavits of European attorneys indicated that, *in such circumstances,* European courts would not accord *res judicata* effect to a United States class action judgment in favor of the defendants when members of the class had taken no affirmative action in the American proceedings (*Id.* at 996–997).

Touche, however, urges that the court in *Bersch* actually held that no action could be certified as a class action when any member of the class is a foreigner, simply because a judgment might not be recognized in the foreigner's own country. Although the *res judicata* problem is one factor to consider in deciding whether to exercise discretionary pendent jurisdiction in a case when a multitude of similar foreign actions are already in active litigation or have been settled, it should not be used to deny these debenture holders—none of whom has commenced any action other than the present one—their only effective redress for the frauds allegedly committed against them in the United States by United States corporations, accounting firms, residents and citizens, especially when this Court otherwise has subject matter jurisdiction. Taken to its logical conclusion, Touche's argument would require that United States courts dismiss any action brought by nationals of certain countries because their countries refuse to recognize the *res judicata* effect of any judgment rendered by an American court that is adverse to its nationals, even when the national was a voluntary plaintiff in the American court. *See* Von Mehren and Trautman,

*Recognition of Foreign Adjudications: A Summary and Suggested Approach,* 81 Harv.L.Rev. 1601 (1968). The absurdity of such a contention is apparent, as United States courts hear cases brought by foreigners against American citizens and entities as a matter of course. In fact, many class actions have been allowed to proceed despite the fact that at least some members of the class were foreigners. *See, e. g., In re Antibiotic Antitrust Actions,* 333 F.Supp. 267 (S.D.N.Y.1971); *Rosenblatt v. Omega Equities Corp.,* 50 F.R.D. 61 (S.D.N.Y.1970). It is hardly conceivable that the Second Circuit meant to create a rule that would deny recourse to plaintiffs pursuing rights under federal statutes.

*Bersch* did rule, however, that the anti-fraud provisions of the federal securities acts apply to losses sustained from offerings of securities outside the United States to foreign citizens or residents when the alleged frauds occurred *within the United States.* In this action, as well as the related actions currently before this Court, all of the significant acts pertaining to the offering of the debentures occurred in the United States, principally in the Southern District of New York. For example, every alleged fraud and negligent act by Touche, arising from its audits of USF, and its preparation and certification of USF's financial statements, happened in the continental United States. Each participant in the alleged wrongful acts resides or is located in this country.

In addition, all of the preparatory work for the ultimate issuance of the debentures took place throughout the United States. Negotiations leading to the offering of the debentures were conducted substantially in the Southern District of New York. Written opinions were both obtained from New York counsel for USF, USFO and the underwriters and, furthermore, delivered to FNCB, as indenture trustee, and to Goldman, Sachs & Co., as representative of the underwriters, in the Southern District of New York. The offering circular for the debentures was drafted and printed in that district, and it expressly provided that the proceeds from the sale of the debentures would be loaned by USFO to USF and, immediately upon receipt of the proceeds of the debentures by USFO, those funds would be transferred by USFO to the account of USF in San Diego, California. Touche signed four of these offering circulars, which contained the December 31, 1969, consolidated financial statement for USF and a consolidated statement of earnings of USF and its subsidiaries for the five-year period ending December 31, 1969, all certified by Touche. The underwriting agreement, pursuant to which Goldman, Sachs & Co. in New York, Singer & Friedlander, Ltd. in London, England, and Banques de Paris et des Pays-Bas in Paris, France, were the leading underwriters, was drafted, printed and executed by USF, USFO and Goldman, Sachs & Co. in the Southern District of New York. The underwriting agreement also provided that the laws of the State of New York would govern its effect and interpretation. In the same district, a trust indenture was executed by FNCB, as indenture trustee, and by USF and USFO. The trust indenture provided that the indenture and the debentures shall be deemed contracts made in the State of New York and governed by the laws of that State. Attached to each of the debentures at the time of offering were warrants for the purchase of common stock of USF, and USF agreed that it would register the shares of common stock subject to the warrants under the Securities Act of 1933 and trade them on the New York Stock Exchange. Both the debentures and the warrants for USF's common stock were drafted and printed in the Southern District of New York. The warrant agreement executed by FNCB, as warrant agent, and by USF and USFO in the Southern District

of New York, provided that it, and the warrants issued pursuant thereto, shall be deemed contracts made in and governed by the laws of the State of New York. Also, the debentures are redeemable in the United States in exchange for United States currency. In connection with the debenture offering, Touche signed a "cold comfort" letter, which was delivered to Goldman, Sachs & Co., as representative of the underwriters, and to FNCB, as indenture trustee, in the Southern District of New York. In that letter, Touche reconfirmed the financial information contained in the offering circular up to and including December 31, 1969, and, furthermore stated that a limited review disclosed no material change in the financial condition of USF during the period from December 31, 1969, through April 8, 1970. A first supplemental indenture and a first supplemental warrant agreement entered into by FNCB, USF and USFO were drafted and printed in the Southern District of New York. FNCB executed these documents in that district, while USF and USFO did so in San Diego, California. The various agreements, the offering circular and the debentures provided that payment thereunder would be made, among other places, in the Southern District of New York. Finally, as the debentures themselves provide, any notice to the holders of the debentures must be proven by publication in three newspapers, some of which are published in the United States.

In conclusion, Touche would have this Court ignore reality and deny class status because of theoretical difficulties having no practical substance. Even if its apprehensions were justified factually, the class action procedure is the only appropriate method by which those fears can be minimized. At the very least, this or any other American court judgment in a class action will be *res judicata* in any future lawsuit commenced in the United States concerning most, if not all, foreign debenture holders. If,

however, class status is denied in this action, all debenture holders will be obliged to institute individual actions in our domestic courts and abroad. This Court submits that Touche correctly perceives that, if this lawsuit is not certified as a class action, few debenture holders will find it economically feasible to commence individual actions, thereby allowing Touche to escape its alleged liability to those holders. Given the American situs of the alleged fraud perpetrated upon these holders, such a result would be unconscionable.

## VI. "OPT-IN" VS. "OPT-OUT" TECHNIQUES

Based upon (1) plaintiffs' affidavits submitted on the question whether foreign courts will recognize a judgment rendered by an American court that affects foreign investors, (2) this Court's examination of certain responses by defendant to interrogatories propounded to it by plaintiffs regarding Touche's "presence" throughout the world, and (3) the remote possibility that subsequent actions will be commenced by debenture holders against Touche abroad, this Court is convinced that notice to all debenture holders pursuant to Rule 23(c)(2) is proper, wherein all class members will be instructed that they will be bound by any judgment rendered in this action unless they affirmatively request exclusion, or, in the vernacular, "opt-out." The rationale underlying this decision is threefold. First, Touche appears immune from service of process in several relevant countries because it has little or no business contracts there. Secondly, an American judgment affecting foreign debenture holders has a fair chance of recognition in foreign courts if an "opt-out" device is utilized. And third, even if a foreign court will not recognize an American judgment concerning its nationals because it may offend their sense of due process, and even if foreign investors were to obtain subsequent

judgments against Touche in their courts, those judgments would be hollow because Touche does not have any assets in those countries from which that judgment could be satisfied. Should the foreign investors seek enforcement of their victories in the United States, the American courts would honor the previous American judgment.

Moreover, there is no case that holds that this Court, on a motion to certify a class action under Rule 23(c), must determine that its judgment, if rendered in favor of a defendant, will be *res judicata* as to all members of the class who do not "opt-out." [20] Indeed, the *Advisory Committee Note of 1966 to Rule 23 As Revised in 1966* states:

> Although thus declaring that the judgment in a class action includes the class, as defined, subdivision (c)(3) does not disturb the recognized principle that the court conducting the action cannot pre-determine the *res judicata* effect of the judgment; this can be tested only in a subsequent action.

*See* Restatement of Judgments, § 86, comment (h) § 116 (1942). The *Advisory Committee Note* then goes on to describe the practical test that this Court should apply on a Rule 23(c) motion:

> The court, however, in framing the judgment in any suit brought as a class action, must decide what its extent or coverage shall be and, if the matter is carefully considered, questions of *res judicata* are less likely to be raised at a later time and if raised will be more satisfactorily answered. (Emphasis added.)

While this Court is mindful that its reasoning could be faulty given different facts, upon the information presented thus far, the "opt-out" procedure appears to be appropriate. Nevertheless, should new facts come to this Court's at-

tention indicating that there exists a substantial possibility that defendant could be sued abroad subsequent to an American judicial determination of its liability, if any, and that a latter foreign action could be enforced abroad because Touche does have assets from which to satisfy that judgment, then the "opt-in" technique should be utilized. By "opting-in," a foreign debenture holder signifies to a foreign court (if he decides to sue Touche subsequent to a judgment in this action) that he has been notified of this action, and that he "affirmatively participated" in this dispute. A review of both plaintiffs' and defendant's affidavits on this subject indicates that there is a substantial likelihood that a foreign court will recognize an American judgment if a foreign investor is shown to have "affirmatively participated" in this lawsuit, and one method of doing so is to "opt-in" or to file a "proof of claim" form.

While the majority of the judiciary and the legal commentators believe that Rule 23 only provides for an "opt-out" procedure and, therefore, advocate its use solely, the history and the language of Rule 23 and recent decisions pertinent thereto permit the establishment of an "opt-in" class. For example, several cases have permitted a notice that required class members to file a "proof of claim" to be included in the class. *See State of Iowa v. Union Asphalt & Roadoils, Inc.*, 281 F.Supp. 391, 403 (S.D.Iowa 1968); *Forbes v. Greater Minneapolis Area Board of Realtors*, 61 F.R.D. 416, 418 (D.Minn.1973); *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452, 459 (E.D. Pa.1968); *Harris v. Jones*, 41 F.R.D. 70, 74 (D.Utah 1966). Numerous cases have permitted "opt-in" classes when the class was composed of governmental entities, such as municipalities and school districts. *See In re Antibiotic Antitrust*

---

20. *Bersch v. Drexel Firestone, Inc. et al.*, 519 F.2d 974 (2d Cir. 1975), was concerned about the *res judicata* effect of a judgment

because that was a situation in which several hundred actions *already* had been brought by the potential class members.

*Actions,* 333 F.Supp. 267, 271 (S.D.N.Y. 1971); *State of Iowa v. Union Asphalt & Roadoils, Inc., supra; Minnesota v. U. S. Steel Corp.,* 44 F.R.D. 559, 577 (D. Minn.1968); *Philadelphia Electric Co. v. Anaconda American Brass Co., supra.* In *State of West Virginia v. Charles Pfizer & Co.,* 440 F.2d 1079 (2d Cir. 1971), *cert. denied,* 404 U.S. 871, 92 S. Ct. 81, 30 L.Ed.2d 115 (1971), the court approved a dual notice to be given to members of a class of consumers at the outset of the litigation. The first was a standard "opt-out" notice, while the second provided that, unless the members of the class filed claims by a specified date, any recovery by the class representatives, the attorneys general of several states, would be allocated to the states for such use as the court deemed proper. Thus, members of the class were required to "opt-in" at the outset to benefit from any judgment or settlement.

Furthermore, Rule 23(d) empowers this Court with discretion to fashion notices that will enable it to do justice. It provides, *inter alia:*

> In the conduct of actions to which this rule applies, the *court may make appropriate orders:* . . . (2) requiring, for the protection of the members of the class or otherwise *for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members* of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to *signify whether they consider* the representation fair and adequate, to intervene and present claims or defenses, or *otherwise to come into the action* . . . . (Emphasis added.) Fed.R.Civ.P. 23(d).

Therefore, although there can be no guaranty of *res judicata* protection in any class action, an "opt-in" class could assuage Touche's fears of subsequent actions should the facts prove this procedure to be necessary.

## VII. CERTIFICATION OF AN APPEAL PURSUANT TO 28 U.S.C. § 1292(b)

In *Eisen v. Carlisle & Jacquelin,* 370 F.2d 119 (2d Cir. 1966), *cert. denied,* 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967), the Second Circuit developed the "death knell" doctrine for reviewing the denial of a class action motion. Since that time the question of whether any order granting or denying class action status is a final appealable order under 28 U.S.C. § 1292(b) has received an inordinate amount of scrutiny by the circuit courts. As recent decisions in this circuit have indicated, Section 1292(b) can be utilized for the review of orders that have either granted or denied class action certification. *Kamm v. California City Development Co.,* 509 F. 2d 205 (9th Cir. 1975); *Kline v. Coldwell, Banker & Co.,* 508 F.2d 226 (9th Cir. 1974); *In re Hotel Telephone Charges,* 500 F.2d 86 (9th Cir. 1974).

Before a Section 1292(b) certification for the review of an order can issue, this Court must find that certain prerequisites have been satisfied, that is, whether: (1) the order involves a "controlling" question of law; (2) there is a substantial ground for difference of opinion; and (3) an immediate appeal would materially advance the ultimate termination of this action. *See generally* Note, *Interlocutory Appeals In The Federal Courts Under 28 U.S.C. § 1292(b),* 88 Harv.L.Rev. 607 (1975). This Court is of the opinion that these requirements have been met. The main thrust of Touche's arguments against class certification is aimed (1) at the "representativeness" requirement of Rule 23(a)(4), (2) at the "predominance" requirement of Rule 23(b)(3), specifically, issues of "duty," "reliance" and "materiality," and (3) at the effect of an American judgment concerning foreign plaintiffs in foreign courts. Since so few orders granting class certification reach the appellate stage, there

is little guidance offered a district judge in deciding some of these matters. Reversal of this order may very well mean the discontinuance of this lawsuit. Moreover, if this action were not permitted to proceed as a class action, both this Court and the litigants would not be faced with managing the many facets of a typical class action, thus saving substantial time and resources for all concerned. Certainly, it can be said that there is a considerable ground for difference of opinion on this Court's reasoning in certifying the class. If this order were reversed, protracted and expensive litigation may be avoided that could result in a material advancement of the termination of this dispute.

Finally, it must be determined what questions are to be certified. One possibility is to certify generally the question whether this Court was correct in certifying a class. Nevertheless, to avoid any abstract expositions and to define the questions as precisely as possible, this Court will certify, *sua sponte*, the following issues:

1) whether the district court was correct in concluding that questions of "duty," "reliance" and "materiality," in the context of this action, were not individual issues that would defeat the "predominance" requirement of Rule 23(b)(3) and make this action unmanageable as a class action;

2) whether the district court was correct in concluding that the named plaintiffs in this action, at this time, are "adequate representatives" within the requirements of Rule 23(a)(4);

3) whether the district court's utilization of the "opt-out" technique for all holders of debentures, in the context of this action, is an appropriate device; and

4) whether the district court's utilization of the alternative "opt-in" technique for all holders of debentures, in the context of this action, is an appropriate device so that any judgment by this or any other American court in this action concerning foreign debenture holders will be recognized and enforced by foreign courts.

Of course, the circuit court is not limited by the contents of this certificate and it may declare its own views on any aspect of this Court's order. Should the appellate court refuse certification, it is urged respectfully that some statement of the reasons for such refusal be made so as to guide this Court on the aforementioned issues and on the use of Section 1292(b) for review purposes.

█ In light of the integral part of this action to the entire USF securities litigation, which is proceeding at a satisfactory pace, this order certifying the class will not be stayed until Section 1292(b) certification is accepted, if at all.

## VIII. CLASS DESIGNATION

This action is designated as a class action on behalf of all holders of 9% Bearer Debentures due April 1, 1982 of U. S. Financial Overseas, N.V., guaranteed by U. S. Financial, Incorporated, who also purchased said debentures between April 8, 1970 and July 23, 1973, inclusive. Sociate Generale de Banque, Rentinvest, North American Fund (A) and ITF Fund, Ltd. are designated as the class representatives. These designations are provisional, and may be broadened, delimited or subdivided to the extent necessary as developments in this action occur. Fed.R.Civ.P. 23(c)(4).

## IX. NOTICE TO CLASS MEMBERS

The class representatives, on behalf of the plaintiff class, shall bear the cost of mailing notice to every ascertainable debenture holder that is found to be within the above-defined class. Publication of notice to all other debenture holders that come within this class shall be provided by the class representatives, on behalf of the plaintiff class, in a manner to be prescribed by this Court. Counsel

for plaintiffs shall forward drafts of the notice, which shall fulfill the requirements of Rule 23(c)(2), to the Court for approval by October 13, 1975.

It is so Ordered.